569 S.E.2d 225

Deleno H. WEBB, III, M.D., Petitioner Below, Appellee,

v.

WEST VIRGINIA BOARD OF MEDICINE, Respondent Below, Appellant.

No. 30032.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 26, 2002.

Decided July 3, 2002.

Sean P. McGinley, Esq., Rudolph L. Di-Trapano, Esq., DiTrapano, Barrett & DiPiero, Charleston, for Appellee.

Deborah Lewis Rodecker, Esq., Charleston, for Appellant.

PER CURIAM.

The West Virginia Board of Medicine (the "Board") appeals a December 27, 2000 order of the Circuit Court of Kanawha County, that vacated a July 21, 1999 order of the Board which revoked the medical license of Deleno H. Webb, M.D. ("Dr.Webb"), stayed such sanction, and placed Dr. Webb on probationary status for a period of five years. This Court has before it the petition for appeal, the entire record, and the briefs and argument of counsel. For the reasons set forth below, the final order is affirmed.

## I.

## BACKGROUND

On November 5, 1993, the Board filed a complaint against Dr. Webb, a Huntington psychiatrist, alleging that the he had violated several medical ethics rules by engaging in a sexual relationship with a patient, Ms. D.[1] Specifically, the complaint alleged that Dr. Webb gave psychiatric care and treatment to Ms. D. during the period of September 1975 through March 1977, and that he was involved in a sexual relationship with Ms. D. during such time.[2] The complaint also averred that while Ms. D. was transferred to the care and treatment of another psychiatrist in March 1977, Dr. Webb continued to give care and treatment to Ms. D. after such time while still maintaining an ongoing sexual relationship with the patient.[3] Dr. Webb answered the complaint by a letter dated October 8, 1992, where he denied ever having had a sexual relationship with Ms. D. during the time when she was his patient.

Dr. Webb later sought a writ of prohibition in the Circuit Court of Kanawha County, asserting that the instant proceeding was precluded under the equitable doctrine of laches. This issue percolated in the circuit court and in proceedings before the Board until it was finally resolved by this Court in *State ex rel. Webb v. West Virginia Bd. of Medicine*, 203 W.Va. 234, 506 S.E.2d 830 (1998), where we upheld the Board's conclusion that laches did not bar action on the present complaint.

After resolution of the laches issue, hearings were conducted on December 17–18, 1998 and March 24, 1999 on the merits of the Board's complaint against Dr. Webb. There are a number of background facts that have never been disputed in this case: Dr. Webb first began treating Ms. D. in September 1975, when the latter was seventeen years old. Ms. D. had been admitted to St. Mary's Hospital in Huntington and diagnosed as suffering from major depressive disorder. After her release from St. Mary's, Ms. D. made one visit to Dr. Webb's office on October 30, 1975, before moving to Columbus, Ohio, to live with her older brother. Dr. Webb's treatment of Ms. D. did not resume until an office visit on July 29, 1976. Ms. D.'s condition later worsened, which resulted in two hospitalizations in October and November 1976. Ms. D.'s care was later transferred to another psychiatrist, Robert W. Hibbard, M.D., with whom Dr. Webb shared an office, although there is conflicting evidence regard-

---

1. Given the sensitive issues raised in this case, we shall identify the complainant using only the last initial of her name.

2. The complaint maintained that such conduct violated former W. Va.Code § 30–3–6 (1974) (1980 Repl.Vol.), based upon Dr. Webb having allegedly "indulge[d] in gross immorality," and "engage[d] in malpractice."

3. Because the alleged conducted spanned the time period both before and after the enactment of the West Virginia Medical Practice Act of 1980, the complaint asserted that such conduct violated both former W. Va.Code § 30–3–6, as well as W. Va.Code § 30–3–14(c)(8), (9), & (17) (1980) (Supp.1985), and the requirements of W. Va.C.S.R. § 11–1A–12.1(e), (j), (r), (s), & (x).

ing whether such change took place following Ms. D.'s discharge from St. Mary's on November 12, 1976, or whether it took effect on March 24, 1977, when Dr. Webb sent a letter to the West Virginia Division of Vocational Rehabilitation requesting that authorization for reimbursement regarding Ms. D.'s treatment be transferred to Dr. Hibbard. It is undisputed that Dr. Webb's professional contact with Ms. D. after March 24, 1977 was limited to approving the refill of medications previously prescribed by Dr. Hibbard, and seeing her while acting as the "on-call" physician covering for Dr. Hibbard when Ms. D. was hospitalized on two occasions in June 1977 and February 1978.

Ms. D. declined to participate in the hearing on the merits, and likewise refused to waive confidentiality restrictions so as to preclude two of the Board's witnesses, Michele Young and John Adams, M.D., from testify at the hearings. In lieu of live testimony from either Ms. Young or Dr. Adams, the Board sought to introduce deposition testimony that had been given by these witnesses in a civil action that had previously been brought by Ms. D. against Dr. Webb alleging medical malpractice. This evidence was admitted by the Board's hearing examiner over the objection of Dr. Webb, who continues to maintain that it was inadmissible hearsay.

Ms. Young, a clinical social worker employed in Dr. Webb's office who began counseling Ms. D. in November 1976, testified in her May 5, 1995 deposition that Ms. D. had told her during a counseling session that she was going to accompany Dr. Webb on a trip to Williamson, where the two would be "staying in a motel." Ms. Young stated that this information caused her to become concerned about a possible sexual relationship between Ms. D. and Dr. Webb. Ms. Young subsequently discussed the matter with Dr. Hibbard, but was told to take the matter directly to Dr. Webb. When Ms. Young later confronted Dr. Webb regarding her concerns, Dr. Webb responded by stating something to the effect that, "I was tempted, but I thought better of it." Ms. Young testified that when Ms. D. later made further reference to a trip to Williamson, she undertook in late March 1977 to have Ms. D.'s care transferred to Dr.

Hibbard. She also stated that she had become "convinced" at some point prior to March 1977 that there was a sexual relationship between Dr. Webb and his patient. Ms. Young indicated that at some later, unspecified point in time, she was told by Ms. D. that she was, in fact, involved in an ongoing sexual relationship with Dr. Webb.

Dr. Adams testified in his deposition conducted on April 28 and June 2, 1995, that he began treating Ms. D. in 1992, and that in his opinion Ms. D.'s existing mental illness was aggravated by her relationship with Dr. Webb.

The Board's expert witness on psychiatric medicine, Seymour Halleck, M.D., testified at the merits hearing that although no standards were in place making it unethical for a psychiatrist to have a sexual relationship with a former patient until the late 1980s, there were nevertheless circumstances where such conduct on the part of the physician could be deemed malpractice. Doctor Halleck concluded that Dr. Webb "knew or should have known that he was dealing with a highly vulnerable sick person. And to ... have sex with her whether he viewed himself as her physician or not is below the standard of care in the profession of psychiatry." He also gave his opinion that Dr. Webb had used his influence within the physician-patient relationship to obtain sex, stating that such influence involved "the power he had as a physician, the feelings she developed toward him, the trust she had in him."

Doctor Halleck further opined, based upon a review of pertinent medical records as well as deposition testimony given in the civil suit brought by Ms. D. against Dr. Webb, that Ms. D. was a patient of Dr. Webb's from September 1976, the time when Dr. Webb first saw Ms. D. at St. Mary's Hospital, until November 1982, which marked the last time that Dr. Webb authorized a refill of Ms. D.'s medications. Doctor Halleck indicated that this determination was dictated by the fact that during this period Dr. Webb had seen Ms. D. while on call and made notes in her chart on such occasions, and because Dr. Webb had authorized the refill of Ms. D.'s prescriptions on various occasions. Doctor Halleck explained that,

it is very clear that if you write prescriptions for a patient, you are the patient's doctor. It is very clear if you put notes in a patient's chart, that you are the patients doctor. It is very clear that when you are on call and responsible for other patients who have other doctors, that at the time you are on call, you are the doctor of every patient ... you take care of.

Doctor Halleck concluded that Dr. Webb's conduct in this matter was unethical, dishonorable, unprofessional, and likely to harm a member of the public.

In his defense, Dr. Webb testified at the merits hearing that he transferred the care of Ms. D. to Dr. Hibbard in November 1976, because Michele Young, who was actually an employee of Dr. Hibbard's, had a good rapport with the patient whereas he did not. Doctor Webb explained that his letter of March 24, 1977, where he requested that Vocational Rehabilitation Services transfer authorization for Ms. D.'s care to Dr. Hibbard, was merely a formality and did not indicate the actual date when Dr. Hibbard took charge of Ms. D.'s treatment. Doctor Webb further testified that he and Ms. D. began their sexual relationship on or about July 17, 1977, a date which he was certain about because he broke his hip the following day. According to Dr. Webb, his sexual contact with Ms. D. was "intermittent," and ceased in 1979 or 1980.[4]

With respect to his conduct in renewing various prescriptions for Ms. D. after their sexual relationship commenced, Dr. Webb indicated that he never saw Ms. D. on these occasions, and that the normal procedure in his office was that if one of Dr. Hibbard's patients required a prescription refill while he was unavailable, the office staff would request authorization from Dr. Webb. On these occasions, according to Dr. Webb, he was often not apprised of the names of the patients for whom he was renewing the prescriptions. Concerning his having seen Ms. D. while on call during two hospitalizations, Dr. Webb explained that on these occasions he was faced with the dilemma of "either hav[ing] no contact with her whatsoever in the hospital or go ahead and honor my agreement with the covering physician and make sure she was medically covered those days I went there." He further stated that "I suppose I could have chosen because of our relationship ... not to see her, but that would constitute abandonment if I didn't make rounds on somebody else's patient that I had agreed to see."

The final witness at the hearing on the merits was Dr. Webb's expert psychiatrist, Robert Granacher, M.D. Doctor Granacher gave his opinion that under the professional standards in place during the late 1970s and early 1980s, Dr. Webb's sexual relationship with Ms. D. did not constitute a breach of any ethical requirement where he had terminated the doctor-patient relationship prior to the commencement of such relationship. As to Dr. Webb's professional contacts with Ms. D. following the transfer of her care to Dr. Hibbard, Dr. Granacher testified that neither Dr. Webb's action in refilling the prescriptions, nor his conduct in seeing Ms. D. while on call were sufficient to create a doctor-patient relationship for purposes making it unethical for him to be engaged in a sexual relationship with the patient.[5]

4. Doctor Webb was impeached on this point by previous testimony in the civil action where he indicated that his relationship with Ms. D. ended in either 1982 or 1983.

5. Doctor Granacher testified as follows on these points:

Q. Are you aware of any ethical rule or literature that would have alerted Dr. Webb at that time, and I'm talking about the time period between 1977 and 1982, that would have alerted Dr. Webb that although he had terminated the physician/patient relationship, the making of prescriptions or agreeing to refill her treating doctor's prescriptions rekindled or reignited or extended the physician/patient relationship?

A. No, sir, I am not.... I am unaware of that as a standard.

....

Q. Doctor, are you aware of any rule of ethics or any literature that would have alerted Dr. Webb at that time, and I'm talking about the period of time from 1977 to 1982, but particularly in 1978 because I believe that's when Dr. Webb ran into Ms. D[.] when he was on call, are you aware of any literature at that time that would have alerted Dr. Webb or any other psychiatrist that he was exposing himself to some breach of the rules of medical ethics

The hearing examiner in this case issued a recommended decision on June 25, 1999, which was subsequently adopted by the Board on July 21, 1999 with only minor corrections. The Board expressly stated that Dr. Webb's testimony "was not uniformly credible," and ultimately found as a matter of fact that "Dr. Webb was engaging in a sexual relationship with [Ms. D.], throughout the period he was treating her as a patient from a time prior to March 1977, through 1982 or 1983 . . . ." It was further concluded that, as a matter of law, "[b]y clear and convincing evidence, [Dr. Webb's] conduct prior to 1980, of engaging in a sexual relationship with his patient [Ms. D.], constituted gross immorality as measured by the standards of the profession at the time, and thus constitutes a violation of W. Va.Code § 30-3-6 prior to 1980." The Board likewise found that Dr. Webb's conduct subsequent to 1980 constituted a violation of W. Va.Code § 30-3-14(c)(8), (9), & (17) (1980) (Supp.1985), and W. Va. C.S.R. § 11-1A-12.1(e), (j), (r), (s), & (x). Both of these legal conclusions were apparently underpinned by the Board's determination that "a Physician/patient relationship existed between Dr. Webb and his patient [Ms. D.] whenever Dr. Webb prescribed medicine to her, even after referral of her case was made to Dr. Hibbard." Significantly, the Board made no similar conclusion with respect to Dr. Webb's professional contact with Ms. D. while acting as an on-call physician. As a result of these violations, the Board ordered that Dr. Webb's license to practice medicine in West Virginia be revoked, with such revocation being stayed during a five-year probationary period where Dr. Webb must, among other conditions, practice under the supervision of another psychiatrist.

Doctor Webb immediately sought judicial review of the Board's determination by a complaint filed in the Circuit Court of Kanawha County on July 23, 1999. Following review of the record in this case, the lower court vacated the Board's decision by an order entered on December 27, 2000, concluding that its findings and conclusions were clearly wrong and otherwise arbitrary and

capricious. It is from this order that the Board now appeals.

## II.

## STANDARD OF REVIEW

Judicial review of disciplinary action taken by the Board is authorized by W. Va.Code § 30-3-14(*l*) (1999), which provides in pertinent part: "Any person against whom disciplinary action is taken pursuant to the provisions of this article has the right to judicial review as provided in articles five and six, chapter twenty-nine-a of this code." The requirements of the West Virginia Administrative Procedures Act were explained in syllabus point one of *West Virginia Health Care Cost Review Authority v. Boone Mem'l Hosp.*, 196 W.Va. 326, 472 S.E.2d 411 (1996):

"'Upon judicial review of a contested case under the West Virginia Administrative Procedure[s] Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." ' Syl. Pt. 2, *Shepherdstown Volunteer Fire Department v. Human Rights Comm'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983)." Syllabus Point 1, *St. Mary's Hospital v. State Health Planning and Development Agency*, 178 W.Va. 792, 364 S.E.2d 805 (1987).

by continuing his sexual relationship thereafter?

A. No, sir, I have been practicing medicine since 1975, and I do not recall that written admonition anywhere, no, sir.

*Accord* Syl. Pt. 1, *Berlow v. West Virginia Bd. of Medicine,* 193 W.Va. 666, 458 S.E.2d 469 (1995) (per curiam).

■ As this Court explained in *Modi v. West Virginia Bd. of Medicine,* 195 W.Va. 230, 239, 465 S.E.2d 230, 239 (1995),

> findings of fact made by an administrative agency will not be disturbed on appeal unless such findings are contrary to the evidence or based on a mistake of law. In other words, the findings must be clearly wrong to warrant judicial interference. . . . Accordingly, absent a mistake of law, findings of fact by an administrative agency supported by substantial evidence should not be disturbed on appeal.

*Id.* at 239, 465 S.E.2d at 239 (citations omitted); *see also Martin v. Randolph County Bd. of Educ.,* 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995) (explaining that "[w]e must uphold any of the [administrative agency's] factual findings that are supported by substantial evidence, and we owe substantial deference to inferences drawn from these facts"). "The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 3, *In re Queen,* 196 W.Va. 442, 473 S.E.2d 483 (1996). Thus, "[t]he scope of review under the arbitrary and capricious standard is narrow, and a court is not to substitute its judgment for that of the hearing examiner." *Martin,* 195 W.Va. at 304, 465 S.E.2d at 406.

■ On appeal, this Court reviews the decisions of the circuit court under the same standard of judicial review that the lower court was required to apply to the decision of the administrative agency. *See id.; accord Wheeling–Pittsburgh Steel Corp. v. Rowing,* 205 W.Va. 286, 293, 517 S.E.2d 763, 770 (1999) (noting in context of Administrative Procedures Act, that "we give no deference to the lower court [but] review *de novo* whether the agency action satisfies the standards of the APA") (internal quotation marks and citations omitted). We review *de novo* conclusions of law and application of law to the facts. *Martin,* 195 W.Va. at 304, 465 S.E.2d at 406.

## III.

## DISCUSSION

■ Although its brief to this Court is somewhat lacking in clarity, the Board appears to make two general substantive arguments in this appeal. First, it contends that the circuit court erred in failing to respect its credibility determinations when it ruled that the Board was clearly wrong in determining that the sexual relationship between Dr. Webb and Ms. D. commenced prior to July 1997. And second, the Board argues that the lower court failed to give proper deference to its interpretation of the requirements of the medical profession as they relate to whether a physician-patient relationship is established when a doctor authorizes a prescription refill or sees a patient while acting "on call." [6] We consider these arguments in turn.

■ As the Board readily acknowledges, disciplinary action taken by it against a physician must be predicated upon clear and convincing proof. W. Va.Code § 30–3–14(b) (1999) (Supp.1999); *see Healy v. West Virginia Bd. of Medicine,* 203 W.Va. 52, 54, 506

---

**6.** The Board also contends that Dr. Webb's substantial rights were not violated—and thus the predicate for obtaining judicial relief under W. Va.Code § 29A–5–4(g) (1998) (1998 Repl.Vol.) was not satisfied—because the right to practice medicine is a privilege rather than a right. We reject this argument. This Court has recognized, consistent with the legislative finding contained in W. Va.Code § 30–1–1a (1996) (1998 Repl. Vol.), that " 'the practice of medicine is a privilege granted to citizens, but not a natural right, and that there is a need to protect the public interest through the licensing procedures.' " *Healy v. West Virginia Bd. of Medicine,* 203 W.Va. 52, 55, 506 S.E.2d 89, 92 (1998) (quoting *Devrnja*

*v. West Virginia Bd. of Medicine,* 185 W.Va. 594, 596, 408 S.E.2d 346, 348 (1991)). If we were to accept, however, the contention that a physician does not have so much as a substantial right to fair treatment in disciplinary proceedings before the Board, it would render the right to seek judicial review contained in W. Va.Code § 30–3–14(*l*) entirely nugatory. *See Brooks v. City of Weirton,* 202 W.Va. 246, 256, 503 S.E.2d 814, 824 (1998) (" 'It is always presumed that the legislature will not enact a meaningless or useless statute.' ") (quoting Syl. Pt. 4, *State ex rel. Hardesty v. Aracoma—Chief Logan No. 4523, Veterans of Foreign Wars of U.S., Inc.,* 147 W.Va. 645, 129 S.E.2d 921 (1963)).

S.E.2d 89, 91 (1998) (per curiam). This Court has emphasized that "[c]lear ... and convincing proof ... is the highest possible standard of civil proof defined as 'that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *Wheeling Dollar Sav. & Trust Co. v. Singer,* 162 W.Va. 502, 510, 250 S.E.2d 369, 374 (1978) (quoting *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118, 123 (1954)); *accord In re Carol B.,* 209 W.Va. 658, 667, 550 S.E.2d 636, 645 (2001).

■ The Board in this case determined as a matter of fact that the sexual relationship between Dr. Webb and Ms. D. had commenced prior to the March 24, 1977 date when Dr. Webb formally transferred the care of Ms. D. to Dr. Hibbard. In overturning the Board's decision, the circuit court concluded that

> [t]he Board's finding that there was a sexual relationship between Dr. Webb and [Ms. D.] prior to July of 1977 and after 1980 is clearly wrong; a careful review of the record shows conclusively that there is no probative or reliable evidence upon which such a finding could be made.

The Board takes issue with this statement, asserting that its fails to take into account either the testimony of Michele Young, or the Board's determination that Dr. Webb's testimony lacked credibility.

This Court has recognized that credibility determinations by the finder of fact in an administrative proceeding are "binding unless patently without basis in the record." *Martin v. Randolph County Bd. of Educ.,* 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995). Moreover, we have consistently emphasized that "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.,* 201 W.Va. 381, 388, 497 S.E.2d 531, 538

(1997); *accord Gum v. Dudley,* 202 W.Va. 477, 484, 505 S.E.2d 391, 398 (1997).

Even totally discounting the testimony of Dr. Webb, however, we find no error in the circuit court's conclusion that there was no clear and convincing proof that the sexual relationship at issue commenced prior to July 1977. While it is true that Ms. Young testified in her deposition that she had become "convinced" at some point prior to March 1977 that there was a sexual relationship between Dr. Webb and his patient, she nevertheless testified to having no direct knowledge of such relationship:

> Q. Now, as of March 24, 1977, I take it you don't know, as you sit here now, whether—at what stage the relationship was in.
>
> A. No.

And our review of Ms. Young's deposition fails to indicate when, in fact, she became aware that such a sexual relationship commenced. In the absence of Dr. Webb's testimony that his relationship with Ms. D. commenced in July 1977, there would be a dearth of probative evidence as to precisely when the first sexual encounter took place. We therefore conclude that the circuit court did not err in concluding that the Board was clearly wrong in determining that there was clear and convincing proof of a sexual relationship between Dr. Webb and Ms. D. prior to the formal transfer of care to Dr. Hibbard in March 1977.

■ The second issue presented by the Board concerns whether the circuit court erred when it ruled that the Board was clearly wrong in finding that Dr. Webb's professional contact with Ms. D. after March 1977, which included refilling prescriptions and seeing her while on call, had the effect of extending the physician-patient relationship beyond the date when Dr. Hibbard assumed formal responsibility for Ms. D.'s care and treatment. The Board contends that its interpretation of the technical and ethical requirements of the medical profession should be given substantial deference,[7] and that

---

7. In making this assertion, the Board cites to *Pons v. Ohio State Med. Bd.,* 66 Ohio St.3d 619, 614 N.E.2d 748 (Ohio 1993), where the Ohio Supreme Court remarked that "when reviewing

a medical board's order, courts must accord due deference to the board's interpretation of the technical and ethical requirements its profession." *Id.* at 621, 614 N.E.2d at 751.

even in the absence of expert testimony it was entitled to base its decision upon the collective expertise and knowledge of its members.[8]

■■■ In effect, the Board argues that it was capable of determining for itself, without the aid of expert testimony, that Dr. Webb's undisputed conduct in refilling prescriptions and seeing Ms. D. while on call extended the physician-patient relationship. This Court notes, however, that W. Va.Code § 30–3–14(b) contains the requirement that

> when there are conflicting views by recognized experts as to whether any alleged conduct breaches an applicable standard of care, the evidence must be clear and convincing before the board may find that the physician has demonstrated a lack of professional competence to practice with a reasonable degree of skill and safety for patients.

Although § 30–3–14(b) speaks in terms of whether certain conduct "breaches an applicable standard of care," we think that the standard of proof mandated by this provision is similarly applicable to other determinations regarding the standards governing the medical profession, including the questions posed in the case *sub judice*. Because there was conflicting evidence regarding the effect of Dr. Webb's conduct subsequent to March 1977, we reject the Board's contention that it was not constrained by the expert testimony presented in this case.

The Court also notes at this point that while the Board's decision expressly concluded that there was clear and convincing evidence that a physician-patient relationship existed between Dr. Webb and Ms. D. based

upon the former's conduct in writing prescriptions,[9] the Board reached no similar conclusion regarding Dr. Webb having seen Ms. D. while being on call in Dr. Hibbard's stead. We therefore limit our inquiry to whether this conclusion by the Board was clearly wrong.

In rejecting the Board's conclusions regarding the effect of Dr. Webb having written prescriptions for Ms. D., the circuit court reasoned as follows:

> [T]he Board's expert Dr. Halleck testified that Dr. Webb's approval of refill prescriptions for [Ms. D.] could extend the physician/patient relationship "if" the complainant was aware that it was Dr. Webb who had given the approval. Upon a review of the record, there was no evidence that [Ms. D.] was aware th[at] Dr. Webb had given the approval for the refills at issue. Indeed, the only evidence of record was that she did not know of his involvement. Thus, based upon this testimony of the Board's own expert, and the whole record, the Court concludes the Board's finding that Dr. Webb's approval of refill prescriptions was sufficient to extend the physician/patient relationship was clearly wrong and against the record evidence.

A review of the administrative record in this case supports the circuit court's conclusion regarding deficiencies in the Board's proof. Doctor Halleck testified that the physician-patient relationship "intermittently gets re-established when [the doctor] writes the prescription," and explained upon further questioning that "[w]e are dealing [here] with [Ms. D.'s] perceptions of who this man [Dr. Webb] is," and "if she sees his name on the

---

8. With respect to the latter assertion, the Board cites to *Batoff v. State Bd. of Psychology*, 561 Pa. 419, 750 A.2d 835 (2000), where the Pennsylvania Supreme Court observed that "Pennsylvania courts have long recognized that administrative boards, comprised of members of the profession they oversee, may base their decisions on the collective expertise of those members." *Id.* at 427, 750 A.2d at 840 (citation omitted).

9. The Board's stated in its conclusions of law that,

> Clear and convincing evidence establishes that a physician/patient relationship existed between Dr. Webb and his patient [Ms. D.] whenever Dr. Webb prescribed a medicine to her,

even after referral of her case had been made to Dr. Hibbard. The weighty testimony of Dr. Halleck in support of this finding is given substantially greater weight than that of Dr. Granacher. To find that a physician/patient relationship does not exist in such case, would mean that any doctor on call who prescribes medications at the emergency room or other facility, or who prescribes medications for the patients of other doctors would thereby not be subject to sanction for his conduct or for other conduct in derogation of the physician/patient relationship....

(Footnote omitted.)

prescriptions, she feels he is her doctor." But as Dr. Halleck acknowledged in his testimony, there was no evidence in the record indicating that Ms. D. was ever aware that it was Dr. Webb who was authorizing the prescription refills:

Q. The truth of the matter is Dr. Webb never saw [Ms. D.] on March the 8th of '82, never saw her on November the 18th of '82, nothing in the record indicates that.

A. He did write the prescriptions and conceivably his name was on the prescription bottle.

. . . .

Q. His name is on the bottle of the refill, presumably?

A. I don't know for sure but it might be.

Our review of the record similarly indicates a paucity of evidence that Ms. D. was ever aware that it was Dr. Webb who had authorized the refill of her prescriptions. Thus, even if we assume that Dr. Halleck's notion of "intermittent" re-establishment of the physician-patient relationship is valid, as was apparently determined by the Board, it fails based upon the lack of evidence to support it in this case. We therefore find no error in the lower court's conclusion that clear and convincing evidence was lacking to support the Board's determination that the physician-patient relationship between Dr. Webb and Ms. D. extended past the March 1977 date when Dr. Webb formally transferred Ms. D.'s care to Dr. Hibbard.

Finally, the Court notes that at one point in its brief, the Board asserts that disciplinary action was justified in this case based upon Dr. Halleck's testimony that Dr. Webb would still have committed malpractice even if Ms. D. were considered to be a former patient. We note, however, that while Dr. Halleck's testimony on this point is acknowledged in the Board's findings of fact, its conclusions regarding Dr. Webb having violated the professional and ethical standards of the medical profession are nevertheless all predicated upon Dr. Webb having "engag[ed] in a sexual relationship *with his patient.*" We must therefore assume that the Board's findings and conclusions regard-

ing the existence of a physician-patient relationship during the period following the transfer of care to Dr. Hibbard was crucial to its decision.

It has long been admonished that "court's may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). Rather, "an agency's discretionary order [must] be upheld, if at all, on the same basis articulated in the order by the agency itself[.]" *Id.* at 169, 83 S.Ct. at 246.

[A] simple but fundamental rule of administrative law ... is ... that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.

*SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *NLRB v. Brookshire Grocery Co.,* 919 F.2d 359, 367 n. 9 (5th Cir.1990) ("The Board's order can be sustained only on the grounds articulated therein.") (citing *Burlington Truck Lines, supra*). While a reviewing court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citation omitted), we find no such clear evidence of the Board's reasoning in the present case. Thus, although the Court is troubled by the fact that questions regarding Dr. Webb's conduct may have gone unheeded during adjudicative proceedings before the Board, we are nevertheless constrained to reject this alternative basis for upholding the Board's disciplinary action.

## IV.

### CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

Justice MAYNARD, deeming himself disqualified, did not participate in the decision in this case.

Judge JAMES P. MAZZONE, sitting by temporary assignment.

MAZZONE, Judge, dissenting:

The facts of this case are troubling. A psychiatrist admits to having had sexual relations over a six year period with a disturbed teenage patient who he was treating and counseling, yet excuses his activities with defenses of: 1) there exist no ethical guidelines which prevent one from having sexual relations with a purported "former" patient, and 2) there existed no physician-patient relationship at the time of the sexual incidents. Despite an overwhelming record, relatively undisputed findings of fact of the Hearing Examiner, an admission by the psychiatrist, and findings of *prima facie* misconduct by this Court in *State ex rel. Deleno H. Webb, M.D. v. West Virginia Board of Medicine,* 203 W.Va. 234, 506 S.E.2d 830 (1998), the majority adopts these erroneous defenses in rendering an opinion that may very well create a double standard in which a physician can be held liable for malpractice as result of a relationship, but yet cannot be disciplined for conduct that also arises out of the same physician-patient relationship. Because I believe the decision of the Board of Medicine was neither clearly wrong nor otherwise prejudicial to the substantial rights of the Appellee, I must respectfully dissent.

## I.

### *Reversal Only Warranted Where Clear Error Exists*

The central issue in this case is whether or not a physician-patient relationship existed at the time Dr. Webb had sexual relations with Ms. D. "Generally, it is axiomatic that unless such a relationship is established a legal duty cannot exist between the parties." *Gooch v. West Virginia Dep't of Pub. Safety,* 195 W.Va. 357, 366, 465 S.E.2d 628, 637 (1995). Indeed, the primary basis for the circuit court's reversal of the Board of Medicine's sanctions is that there existed no physician-patient relationship at the time of the sexual encounters.

The law that guides a circuit court's review of an appealed administrative order is the same standard that guides this Court's review. *Martin v. Randolph County Bd. of Educ.,* 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995) ("This Court reviews decisions of the circuit under the same standard as that by which the circuit [court] reviews the decision of the ALJ .... We review *de novo* the conclusions of law and application of law to the facts."). Hence, in consideration of an appealed administrative ruling, this Court has held:

"Upon judicial review of a contested case under the West Virginia Administrative Procedure[s] Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are '(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.'" Syl. Pt. 2, *Shepherdstown Volunteer Fire Department v. Human Rights Commission,* 172 W.Va. 627, 309 S.E.2d 342 (1983). 'Syllabus Point 1, *St. Mary's Hospital v. State Health Planning and Development Agency,* 178 W.Va. 792, 364 S.E.2d 805 (1987).' *Syllabus Point 1, HCCRA v. Boone Me-*

*morial Hospital,* 196 W.Va. 326, 472 S.E.2d 411 (1996).

Syl. Pt. 1, *Clark v. West Virginia Bd. of Med.,* 203 W.Va. 394, 508 S.E.2d 111 (1998). *See also Healy v. West Virginia Bd. of Med.,* 203 W.Va. 52, 506 S.E.2d 89 (1998); *Modi v. West Virginia Bd. of Med.,* 195 W.Va. 230, 465 S.E.2d 230 (1995).

In the case *sub judice,* the circuit court, sitting as an appellate court, determined that the order of the Board of Medicine was clearly wrong in view of the reliable, probative and substantial evidence on the whole record. "In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo.*" Syl. Pt. 2, *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996).

## A.

### *Findings of Fact Support Conclusions of Law*

In recognition of this standard of review and having reviewed the order of the circuit court contemporaneously with the Hearing Examiner's Findings of Fact and Conclusions of Law, I believe the circuit court abused its discretion in reversing the Appellee's sanction. The findings of fact in this case are largely unrefuted. The Appellee admits that he engaged in sexual relations with a troubled teenager that he had been treating. He admits that he began sexual relations with the teenager in July 1977. However, he maintains that he "transferred" the teenage patient to his partner by letter in March 1977. Thereafter, the Appellee admits that he did treat her during a hospital stay in February 1978. According to the record, this treatment included personal visits and checks in the hospital, prescription ordering, and general patient assessment. Following this hospitalization, the Appellee admits to additional sexual encounters. Additionally, the record in this case demonstrates many more findings of fact buttressing an overall conclusion that the Appellee violated the then-ethical guidelines. In discounting this finding, the circuit court concluded that it was unsupported in the record. As recognized by the majority, the record does include the depositional testimony of an employee of the Appellee's that the "transfer" letter in March 1977 was a response to her concern about an existing sexual relationship between the Appellee and Ms. D.

Although counsel for the Appellee strenuously asserts that the Board of Medicine's findings of fact are rubber-stamped findings of the hearing examiner, the result nonetheless remains that the findings of fact must be given some deference. Indeed, appellate courts reviewing the facts may very well disagree as to their inferences or their conclusions, as has been done in the case *sub judice.* However, in consideration of whether an administrative ruling should be disturbed on appeal, this Court has observed that:

[t]his standard does not entitle a reviewing court to reverse the finder of fact simply because it may have decided the case differently. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985). " 'In applying the clearly erroneous standard to the findings of a [lower tribunal] sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo.' " 470 U.S. at 573, 105 S.Ct. at 1511, 84 L.Ed.2d at 528, quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 148 (1969). Indeed, if the lower tribunal's conclusion is plausible when viewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently if it had been the trier of fact. 470 U.S. at 573–74, 105 S.Ct. at 1511, 84 L.Ed.2d at 528. Moreover, we must afford the lower tribunal's findings great weight in this case because the factual determinations largely are based on witness credibility.

*Board of Educ. of County of Mercer v. Wirt,* 192 W.Va. 568, 578, 453 S.E.2d 402, 412 (1994). Similarly,

Under the clearly erroneous standard, if the findings of fact and the inferences drawn by a family law master are supported by substantial evidence, such findings and inferences may not be overturned even if a circuit court may be inclined to make different findings or draw contrary inferences.

Syl. Pt. 3, *Stephen L.H. v. Sherry L.H.*, 195 W.Va. 384, 465 S.E.2d 841 (1995).

The circuit court, majority, and I clearly have differing inferences and application of the facts to the law. However, despite my disagreement with the legal analysis of the majority, the record in this case supports the findings of fact and should not be so readily cast aside. As with many cases, especially those involving purported he-said/she-said evidence, the appellate court must rely upon the lower tribunal's factual determinations as the fact finder is in the best situation to make credibility assessments.

## B.

### *The Purported "Termination" is Nothing More Than a Straw House*

Because the linchpin of the circuit court's reversal is that all of the admitted sexual activity occurred after the Appellee "transferred" Ms. D. to his partner, I feel compelled to address the merits of this attempted ceasation of the physician-patient relationship by transferring the patient over to a partner in the same medical practice. Any determination as to the existence of a physician-patient relationship falls upon an evaluation of the facts of an individual case. While our common law has derived certain definitional requirements for the creation of a relationship, the determination as to when a physician-patient relationship is terminated is more elusive and cryptic to define.[1] Other jurisdictions and commentators have briefly approached the issue, but no concrete guidance can be derived.[2] Determination of the existence of a relationship is resolved on a case-by-case basis.

Notwithstanding this, I do not believe the facts of this case support a finding that the relationship between Dr. Webb and Ms. D. was terminated by the letter transfer. First, Ms. D.'s, perception as to the existence of the relationship should be given greater weight and consideration. According to the evidence, the Appellee unilaterally dictated a letter "transferring" Ms. D. from his care and placed her in the care of his partner in the same office. The record does not reflect that any discussion took place between the Appellee and Ms. D. wherein he informed her that the relationship needed to terminate. While such a conversation is presumed, the record is not clear as to whether Dr. Webb actually advised Ms. D. that she needed to seek another therapist outside of his practice group. To be clear, I am not suggesting that a physician needs approval from the patient prior to termination of the

1. Syl. Pt. 1, *State ex rel. Kitzmiller v. Henning*, 190 W.Va. 142, 437 S.E.2d 452 (1993) ("A fiduciary relationship exists between a physician and a patient."); *Rand v. Miller*, 185 W.Va. 705, 408 S.E.2d 655 (1991) ("A physician who undertakes to evaluate a prospective employee's medical records for the employer lacks a sufficient professional relationship with the employee to support a malpractice action.")

2. *See generally* Tanya J. Dobash, Note, *Physician–Patient Sexual Conduct: The Battle Between the State and the Medical Profession*, 50 Wash. & Lee L.Rev. 172 (1993); Catherine S. Leffler, Note, *Sexual Conduct Within the Physician–Patient Relationship: A Statutory Framework for Disciplining this Breach of Fiduciary Duty*, 1 Widener L. Symp. J. 501 (1996); Molly E. Slaughter, Note, *Misuse of the Psychotherapist–Patient Privilege in Weisbeck v. Hess: A Step Backward in the Prohibition of Sexual Exploitation of a Patient by a Psychotherapist*, 41 S.D. L.Rev. 574 (1996).

For an annotated listing of cases on this issue, see Michael R. Flaherty, Annotation, *Improper Sexually Related Conduct Toward Patient as Ground for Disciplinary Action Against Physician, Dentist, or Other Licensed Healer*, 59 A.L.R.4th 1104 (1988), and James L. Rigelhaupt, Jr., Annotation, *What Constitutes Physician–Patient Relationship for Malpractice Purposes*, 17 A.L.R.4th 132 (1982). *See* Sexual conduct within the Physician–Patient Relationship: A statutory framework for disciplining this breach of fiduciary duty, 1 Widener L. Symp. J. 501(1996); Misuse of the Psychotherapist–Patient privilege in Weisbeck v. Hess: A step backward in the prohibition of sexual exploitation of a patient by a psychotherapist, 41 S.D.L.Rev. 574 (1996); Physician-patient sexual conduct: the battle between the state and the medical profession, 50 Wash. & Lee L.Rev. 1725 (1993).

relationship. Rather, a conscientious physician who desires to avoid the legal pitfalls associated with "abandonment" of a patient or malpractice should desire to clearly express the termination of their relationship.

Further, the record does not support a finding that Ms. D. was even aware of the termination of the relationship.[3] After the "transfer," she remained in the same practice group of therapists. When the Appellee's partner was away or unavailable, the Appellee took over her treatment.[4] This is reflected by the February 1978 hospitalization. Aside from any argument that a relationship could be imputed upon the Appellee under an Agency theory, the Appellee did not take an active affirmative step to clearly terminate the relationship. Rather, he allowed himself to be placed in situations where he would be called upon to treat and care for Ms. D. in non-emergency situations.

Given the factual record in this case and consideration being given to the delicate mental state of a troubled teenaged girl who is having sexual relations with her "former" therapist, it is a logical conclusion that a reasonable person in the shoes of Ms. D. would believe that a physician-patient relationship still existed after the alleged transfer, assuming that the letter "transfer" was in and of itself enough.

Hence, remand back to the Board of Medicine for further consideration with regard to these factual issues would be a reasoned approach. The record in this case supports the notion that a factual issue existed with regard to whether the Appellee terminated their physician-patient relationship. In the case *sub judice*, the hearing examiner was the trier of fact and determined that the relationship had not terminated. These findings of the Hearing examiner, as the trier of fact, must be given deference. The conclusion of the circuit court that the sexual relationship began after the termination of the relationship was in error and constituted an abuse of discretion that warrants this Court's reversal and re-institution of the Board's recommended sanctions.

## II.

### *The Physician–Patient Relationship*

Having reviewed the circuit court's order, and the Appellee's admissions of a six-year sexual relationship with his "former" teenage patient, I am strained to understand how the majority adopts the proposition that there

---

**3.** See *Pundy v. Department of Professional Regulation*, 211 Ill.App.3d 475, 155 Ill.Dec. 945, 570 N.E.2d 458 (Ill.App.1991), in which the Appellate Court of Illinois upheld a six-month suspension of a psychiatrist's medical license. One of the central issues involved was whether or not the relationship had terminated at the time sexual relations began. In reference to the Department of Professional Regulation's Findings of Fact, the Court noted that:

> Dr. Staunton testified that while the Physician's Code of Ethics did not address the issue of sexual relations with a former patient, each case must be decided according to whether this behavior could have a deleterious effect on the former patient. Similarly, Dr. Schoener testified that such cases should be resolved on the basis of whether there was an exploitation of the therapeutic relationship. Dr. Schoener also testified that if the former patient still remains a tie to the therapist or still relates to the doctor as a therapist it is not clear that therapy ended. Moreover, he stated that it was entirely the physician's responsibility to prevent sexual relations from occurring between the psychiatrist and his patient.

*Pundy*, 155 Ill.Dec. 945, 570 N.E.2d. at 464. In addition, the Illinois Appellate Court further cited the conclusion of the Board which is very applicable to the case *sub judice:*

> "What is right is that a patient should not be harmed by a doctor. That principle applies whether formal termination has occurred or not. An obligation attaches once he or she comes under the care of a physician that does not disappear until there has been a proper ending to that relationship.
>
> "As has been noted above, a special measure of dependence arises, indeed may even be encouraged in many cases, from the psychiatrist/patient relationship—no matter how brief or supportive—that finds its genesis in the emotional vulnerability of the patient. At best, Dr. Pundy was not fully conscious of this patient's vulnerability, and this insensitivity to her condition led in ways clearly detrimental to her welfare."

*Id.*

**4.** See *Ishler v. Miller*, 56 Ohio St.2d 447, 384 N.E.2d 296 (Ohio 1978), in which the Supreme Court of Ohio held that although the doctor referred the patient to a specialist for further treatment, the doctor-patient relationship did not end at that time since the defendant doctor continued to treat the patient on occasion and to prescribe medication.

existed no physician-patient relationship in view of this Court's holding in Syllabus Point 1, *Weaver v. Union Carbide Corporation,* 180 W.Va. 556, 378 S.E.2d 105 (1989):

> It is generally recognized that sexual intimacy with a patient, induced by a marriage or other counselor, is a form of malpractice permitting recovery of damages for emotional distress and other harm resulting from the malpractice. The basis of the malpractice is the trust relationship that arises from such counseling services which are designed to improve the mental and emotional well being of the patient. In such a situation, it is recognized that the patient may become emotionally dependent on the counselor and be easily manipulated by an unscrupulous counselor.

Indeed, the factual findings of this case clearly support the conclusion that a trust relationship existed between the Appellee and Ms. D.

> Whether a trust relationship exists in therapist counseling depends on two primary factors, together with any other relevant circumstances. First, the therapy must have been conducted over a sufficient period of time to establish a trust relationship. Second, there must be some reasonable semblance of actual therapy sessions.

Syl. Pt. 4, *Sisson v. Seneca Mental Health/Mental Retardation Council, Inc.,* 185 W.Va. 33, 404 S.E.2d 425 (1991).

Not surprisingly, recognition of this liability even appears in this Court's first opinion in this case. In footnote 4 of *State ex rel. Deleno H. Webb, M.D. v. West Virginia Board of Medicine,* 203 W.Va. at 238, 506 S.E.2d at 834, the majority astutely noted:

> Dr. Webb claimed that he began having sex with Ms. D., not in 1975 when she first became his patient, but in 1977, *after he "transferred" her to another doctor in the same practice group.* However, the record shows that over a several-year-long period after the alleged transfer, Dr. Webb prescribed medicine for Ms. D., gave orders at hospitals regarding her care, and otherwise took responsibility for her medical care. During this period of time, Dr. Webb admitted to having sex with Ms. D.

> *Given this strong prima facie evidence of misconduct,* in the form of an admission by Dr. Webb, the examiner was clearly justified in finding that any prejudice from delay in the Ms. D. case was *de minimis.* See generally, *Pons v. Ohio State Medical Board,* 66 Ohio St.3d 619, 614 N.E.2d 748 (1993), for a case involving similar alleged physician misconduct.

> As to Dr. Webb's role in causing any delay, Dr. Adams, Ms. D.'s treating physician in 1992 (when Ms. D. made her complaint to the Board about Dr. Webb), testified how Dr. Webb used his physician status to exercise psychological dominance in his relationship with Ms. D., and explained how this dominance precluded Ms. D. from fully appreciating both the wrongfulness of Dr. Webb's conduct and the need to report Dr. Webb's conduct to protect other vulnerable patients.

(Emphasis Added).

In four years, the factual findings of the hearing examiner have borne out further support for the above proposition. However, this proposition is now being silenced by the majority's belief that no physician-patient relationship existed. Today's majority may very well set a precedent where one may be liable for malpractice, yet free of any discipline. Should this Court recognize a relationship for purposes of civil malpractice, but find no relationship for disciplinary action? The result of today's majority opinion may be interpreted to mean that a physician who has sexual relations with a patient, while still involved in a trust relationship with that the patient, can not be disciplined for ethical violations, despite the fact that he/she can be held liable for medical malpractice as a result of this same trust relationship.

Finally, it must not be forgotten that the standard of review in this case is *de novo* with respect to conclusions of law and application of law to the facts. Because I believe the Board's conclusions of law are properly supported by the facts of this case, as well as established case law, the administrative ruling and sanctions of the Board of Medicine should have been upheld.

For all the forgoing reasons, I respectfully dissent. I am authorized to state that Chief

Justice DAVIS joins me in this dissenting opinion.