# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Philip Fisher, D.O.,**
**Respondent Below, Petitioner**

**vs) No. 15-0690** (Kanawha County 15-AA-7)

**West Virginia Board of**
**Osteopathic Medicine,**
**Petitioner Below, Respondent**

**FILED**

**June 3, 2016**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner and respondent below Philip O. Fisher, D.O., by counsel Donald Jarrell, appeals the June 12, 2015, order of the Circuit Court of Kanawha County that affirmed the decision of respondent and petitioner below the West Virginia Board of Osteopathic Medicine ("Board") to revoke petitioner's license to practice osteopathic medicine and surgery in West Virginia. Respondent, by counsel Jennifer K. Akers, filed a response in support of the circuit court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

### Procedural History

Petitioner has been licensed to practice osteopathic medicine and surgery in West Virginia since 1995. He operated the Huntington Spine Rehab & Pain Center. The Board filed statements of charges on February 9, 2011, and August 26, 2011, in which it alleged a variety of unprofessional and unethical conduct on the part of petitioner. Also on August 26, 2011, the Board summarily and immediately suspended petitioner's license to practice until further order of the Board or a court of competent jurisdiction. A hearing was thereafter conducted regarding petitioner's suspension. On October 24, 2011, Hearing Examiner Carole Bloom issued a recommended decision recommending that the Board affirm the summary suspension. On November 11, 2011, the Board adopted the recommended decision. Petitioner did not appeal the suspension order.

A hearing to determine whether petitioner's osteopathic license should be revoked was conducted on July 28, and August 1, 4, 6, and 8, 2014, before Hearing Examiner Janis Reynolds. By order entered December 11, 2014, the hearing examiner issued findings of fact, conclusions

1

of law, and a recommendation that petitioner's license to practice be revoked, which recommendation was thereafter adopted by the Board. *See* W.Va. Code § 30-1-8.[1] Petitioner appealed the Board's decision to the circuit court. By order entered June 12, 2015, the circuit court affirmed the Board's decision. This appeal followed.

<u>Patient 1</u>

Patient 1 died at her home on November 29, 2009. The Board found that petitioner treated Patient 1 from December 2007 until the time of her death for Epstein-Barr syndrome and other disorders. The evidence revealed that Patient 1 worked for petitioner as a registered nurse anesthetist; had a sexual relationship with him; lived in his house; and had access to prescription drugs that other patients had returned to petitioner and that were left in petitioner's office. According to the autopsy, the death was accidental and the cause of death was "the result of combined fentanyl, alprazolam, doxylamine intoxication, due to application of non-prescribed fentanyl patch."[2]

The Board concluded that petitioner's failure to properly secure and/or destroy controlled substances that were returned to him by patients allowed Patient 1 to divert these controlled substances and that they contributed to her death, in violation of 24 C.S.R. § 1-18.1.10 (2001).[3] The Board further concluded that petitioner violated 24 C.S.R. § 1-18.1.5 (2001)[4] "by keeping

---

[1] West Virginia Code § 30-1-8, inter alia, authorizes the Board to suspend or revoke an individual's license to practice osteopathic medicine.

[2] In connection with the investigation into the death of Patient 1, a small metal safe was found in petitioner's home that contained prescription bottles of controlled substances that had been prescribed for other patients.

[3] 24 C.S.R. § 1-18.1.10 (2001) states that

The Board may deny an application for a license, place a licensee on probation, suspend a license, limit or restrict a license or revoke any license issued by the Board, upon satisfactory proof that the licensee has:

Engaged in unprofessional conduct, including, but not limited to, any departure from, or failure to conform to, the standards of acceptable and prevailing medical practice, or the ethics of the osteopathic medical profession, irrespective of whether or not a patient is injured by the conduct, or has committed any act contrary to honesty, justice or good morals, whether the act is committed in the course of his or her practice and whether committed within or without this State[.]

[4] 24 C.S.R. § 1-18.1.5 (2001) states:

(continued . . .)

controlled substance medications that had been returned by some of his patients for the purpose of redistributing these substances to other persons, and by actually distributing them to other persons [i.e., a fentanyl patch], such as Patient 1." Finally, the Board concluded that, by "engag[ing] in sexual activity within a patient-physician relationship," petitioner violated 24 C.S.R. § 1-18.1.10.

### Patient 2

Patient 2 died at her home on November 13, 2004, due to the acute combined toxicity of prescribed fentanyl, oxycodone, sertraline, olanzapine, and ethanol.[5] Upon her death, fentanyl and oxycodone were found to be present in the blood at concentrations that can cause fatal respiratory depression. Petitioner treated Patient 2 from May 2001 until her death. Patient 2 reportedly suffered from numerous ailments including, but not limited to, bursitis, headaches, gout, and lumbar spine pain. The Board found that petitioner was aware that she had been misusing her immediate release fentanyl and that, although he ceased prescribing this medication for a period of time, he eventually resumed prescribing it, and subsequently wrote refills. Petitioner also prescribed oxycodone without seeing Patient 2 in his office. The Board's expert, Dr. Jason Pope, testified that petitioner's diagnosis of Patient 2 did not warrant the prescriptions of the drugs petitioner prescribed.

The Board concluded that petitioner's treatment of Patient 2 violated 24 C.S.R. § 1-18.1.10 "by routinely prescribing controlled substances in such amounts, frequency and duration to Patient [2], without adequately monitoring the patient's drug use."

### Patient 3

Patient 3, a fifty-six year-old male, died on June 26, 2007, from "combined heroin, alprazolam, and temazepam intoxication, with evidence of needle-type drug use and recent cocaine use." Petitioner had treated Patient 3 since April 28, 2003, and routinely prescribed controlled substances for this patient. Given that petitioner failed to submit office visit notes into the record below for Patient 3, the Board found that there was no evidence that petitioner monitored this patient's use of controlled substances through pill counts, urine drug screens, or pharmacy reports.

---

The Board may deny an application for a license, place a licensee on probation, suspend a license, limit or restrict a license or revoke any license issued by the Board, upon satisfactory proof that the licensee has:

Engaged in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public or any member of the public[.]

[5] Patient 2 was also being treated by a psychiatrist, who prescribed anti-depressants and anti-psychotic medications.

The Board concluded that petitioner violated 24 C.S.R. §§ 1-18.1.5 and 18.1.10 by routinely prescribing controlled substances to Patient 3 in such amounts, frequency, and duration, without adequately monitoring his drug use, "which conduct was a contributing cause of Patient 3's death."

### Patient 4

Patient 4, a forty-one year-old male, died on May 17, 2008, due to combined fentanyl, propoxyphene, hydroxyzine, and diazepam intoxication. Petitioner treated Patient 4 from July 2005 until at least April 24, 2008.[6] The Board found that, although Patient 4 missed several appointments with petitioner, petitioner continued to write prescriptions for controlled substances for him. The Board further found that petitioner failed to monitor Patient 4 through urine drug screens, pill counts, or pharmacy reports, which would have shown that Patient 4 was diverting his prescribed medicine and obtaining drugs from other providers.

The Board concluded that petitioner violated 24 C.S.R. §§ 1-18.1.5 and 18.1.10 by routinely prescribing controlled substances to Patient 4 in such amounts, frequency, and duration, without adequately monitoring his drug use, "which conduct was a contributing cause of Patient 4's death."

### Patient 5

Patient 5, a thirty-nine year-old male, died on April 24, 2008, from bronchopneumonia due to the acute combined effects of methadone, fluoxetine, and dextromethorphan, with a contributory cause of hypertensive cardiovascular disease with mild coronary artery stenosis. The Board found that petitioner first treated Patient 5 on April 22, 2008, when he presented with a significant medical history of motor vehicle accidents and surgeries. In a questionnaire he completed for petitioner, Patient 5 listed the drugs he was taking. Following examination, petitioner increased Patient 5's methadone, maintained his dose of Klonopin, prescribed Lunesta, and took him off of Roxicodone, Neurontin, and Prozac. In doing so, petitioner did not first contact Patient 5's previous physician or perform a urine drug screen.

The Board concluded that petitioner violated and 24 C.S.R. § 1-18.1.24 (2001)[7] and

---

[6] Though petitioner also routinely prescribed hydrocodone and temazepam for Patient 4, these drugs were not present in his system at the time of death.

[7] 24 C.S.R. § 1-18.1.24 (2001) states:

The Board may deny an application for a license, place a licensee on probation, suspend a license, limit or restrict a license or revoke any license issued by the Board, upon satisfactory proof that the licensee has:

Engaged in malpractice or failed to practice medicine with that level of care, skill and treatment which is recognized by a reasonable, prudent physician (continued . . .)

4

18.1.10 in his treatment of Patient 5, by prescribing a controlled substance in such amounts and frequency, under the circumstances, which treatment contributed to the death of Patient 5. Finally, the Board concluded that petitioner's "acts and failures were a direct cause of Patient 5's death."

Patient 6

Patient 6, a fifty-two year-old male, died on February 16, 2009, due to combined intoxication by prescribed oxycodone and alprazolam. Petitioner treated Patient 6 from January 28, 2008, until his death. The Board found that, beginning with his first visit, petitioner knew that Patient 6 was obtaining multiple prescriptions for controlled substances from other providers and using different pharmacies to fill prescriptions. Nonetheless, petitioner prescribed 120 15 mg oxycodone pills in February, in March, and in April 2008, without consulting with the patient. Petitioner refilled the patient's oxycodone prescriptions in May and June 2008 and again in August 2008 (at which time petitioner also prescribed alprazolam) and continued to do so until Patient 6's death.[8]

The Board concluded that petitioner's conduct "involving Patient 6 constitute[s] unprofessional conduct," in violation of 24 C.S.R. § 1-18.1.10. The Board further concluded that petitioner's "acts and failures were a contributing cause of the death of Patient 6."

Patient 7

Patient 7, a thirty-seven year-old male, died on October 10, 2009, from oxycodone and alprazolam insufflation. Petitioner treated Patient 7 from December 2003 to October 2004, and then again beginning in May 2008. The Board found that petitioner was advised that Patient 7 was routinely receiving multiple controlled substances from other providers, which is an indication of misuse or diversion. For over a year preceding Patient 7's death, petitioner prescribed a variety of drugs, including hydrocodone, alprazolam, zolpidem tartrate, OxyContin, carisoprodol, Lortab, and Xanax. The Board found that petitioner failed to monitor Patient 7, yet continued to prescribe controlled substances for him. Dr. Matthew Ranson, one of the Board's experts, testified that it was not within the standard of care for a physician to provide so many different prescriptions within the span of one week and that he knew of no prudent pain management physician who would provide a patient with two immediate release opioid medications at the same time as petitioner did.

The Board concluded that petitioner violated 24 C.S.R. § 1-18.1.24. by prescribing controlled substances "in such amounts, frequency and duration, without adequately monitoring the patient's drug use, while knowing Patient 7 was at risk of misuse or diversion of controlled

engaged in the same or a similar specialty as being acceptable under similar conditions and circumstances[.]

[8] Petitioner's former medical partner refilled Patient 6's oxycodone prescription in July and October 2008.

substances[.]" The Board further concluded that petitioner's actions were "a contributing cause of the death of Patient 7."

## Patient 8

Petitioner had treated Patient 8 since 1997. Patient 8, an osteopathic physician, had previously injured his back. Petitioner knew that, in 2006, Patient 8 was receiving controlled substances from multiple doctors. Even though petitioner advised Patient 8 that this conduct violated his "drug agreement" and that he (Patient 8) could be dismissed from his practice for such conduct, petitioner did not take any further action and continued to prescribe controlled substances to Patient 8. Patient 8 entered into rehabilitation treatment and, upon his discharge, a detailed discharge plan and Treatment Plan Agreement required, among other things, frequent monitoring and monthly reports by petitioner as one of his physicians. The Board found that petitioner failed to regularly provide the required monthly reports. Petitioner proceeded to prescribe suboxone for Patient 8 from August 2008 through December 15, 2010, without ever seeing him, even though the record clearly showed that this patient had addiction problems and was self-prescribing. The Board found that petitioner failed to monitor Patient 8 with urine drug screens, pharmacy reports, pill counts, or face-to-face visits. According to the Board's expert, Dr. Pope, patients taking suboxone need to be vigilantly monitored to check for efficacy and potential side effects. Dr. Pope testified that face-to-face visits with the patient are essential and that petitioner failed to meet the standard of care expected in a situation such as Patient 8's.

The Board concluded that petitioner violated 24 C.S.R. §§ 1-18.1.5 and 18.1.10 "by routinely prescribing controlled substances to Patient 8, without seeing or monitoring him for a period of almost one year."

## Patient 10[9]

The Board found that petitioner became romantically and sexually involved with Patient 10 while she was his patient. The Board further found that petitioner treated her with controlled substances and injections from August 14, 2009, to September 7, 2010. Patient 10 lived in petitioner's house for approximately two months, during which time he gave her three cortisone injections. After Patient 10 was placed on medical leave, petitioner set up a cot in his office for her to use.

The Board concluded that petitioner 24 C.S.R. § 1-18.1.5 "by engaging in a romantic and sexual relationship with patient 10, while Patient 10 was [petitioner's] patient."

## Patient 11

Petitioner treated Patient 11, a forty-five year-old female, in 2006 and again from August 2009 until August 2011 for osteoarthritis and spondylolisthesis. During this latter period, he

---

[9] The parties' briefs do not indicate whether or how charges relating to Patient 9 were resolved.

6

prescribed hydrocodone, oxycodone, and phentermine, without monitoring her or ever giving her a urine drug screen or doing a pill count. The Board found that petitioner developed and maintained a romantic relationship with Patient 11 while she was his patient.

The Board concluded that petitioner violated 24 C.S.R. § 1-18.1.5. "by engaging in a romantic and sexual relationship with Patient 11, while Patient 11 was [petitioner's] patient."

<u>April 17, 2010, Incident at the Tri-State Airport</u>

Petitioner and Patient 10 checked baggage on a flight from Huntington, West Virginia, to Florida. Airport police were alerted that suspicious items were found in petitioner's bag, including disposable needles, bottles of injectable medicine, and several bottles of medications. Only one of the bottles was prescribed to petitioner, while other bottles of oxycodone and hydrocodone were prescribed for Patients identified as R.P. and C.M., respectively. The Board found that, when questioned by airport police, petitioner gave vague and conflicting answers. The Board further found that petitioner's explanation at the hearing about this medication did "not make sense." Patient 10 testified that her memory was vague about this incident but claimed that it was she who was using the bag at issue and had borrowed it from petitioner.

<u>Pre-signed Prescription Pads</u>

Former employees of petitioner's practice testified that petitioner began pre-signing prescriptions on a daily basis beginning in 2009, after his medical partner left the practice.[10] The Board found that employees alternated working "late night" shifts which required, inter alia, that they respond to prescription refill requests. When a refill request would come in by computer, petitioner's employees would check the patient's file and, if it was determined that the patient had been seen in the preceding six months, the employee would take a blank, pre-signed prescription and write the name of the drug, the dosage and amount, and the patient's name and date. Employees testified about specific dates when petitioner also pre-signed blank prescription pads when he was going to be out of town. The Board found that, at various times when petitioner was out of town, multiple prescriptions were sent out to be filled on forms petitioner had pre-signed for patients who were not seen by petitioner or any other physician.[11]

The Board concluded that, by pre-signing blank prescription forms and allowing his office staff to fill out these forms, knowing that "'they were not qualified by training, experience or licensure to perform the[se] responsibilities[,]'" petitioner violated 24 C.S.R. §§ 1-18.1.27 [12]and 29[13] (2001).

---

[10] Petitioner's former medical partner, Dr. Lois Weixler, is also petitioner's former wife.

[11] Photographs of multiple pre-signed prescriptions were taken by one of petitioner's employees on August 6, 2010, and were sent to the Board.

[12] 24 C.S.R. § 1-18.1.27 (2001) states:

(continued . . .)

## Failure to lock up controlled substances

Petitioner admitted, and other witnesses confirmed, that unused controlled substances that had been returned to petitioner's office would sometimes sit on petitioner's desk while he was seeing patients. Photographs evidencing petitioner's failure to lock up controlled substances were admitted into evidence during the hearing before the Board.

The Board concluded that petitioner violated 24 C.S.R. § 1-18.1.10 "by keeping controlled substances in his office, in his home and in his personal possession, without taking reasonable steps to secure and dispose of those medications[.]"

## Failure to Maintain Patient Records

In January 2011, the Board issued a subpoena to petitioner's office for a number of patient medical records. The Board learned that several of the requested records had been seized by the DEA during a raid on the office in December 2010. The Board found that petitioner prescribed controlled substances for one of his employees, identified as J.S., who was not petitioner's patient and for whom no records existed. The Board further found that petitioner prescribed a controlled substance for A.H. on October 28, 2009, and for D.W. on October 31, 2009, but that neither A.H. nor D.W. were petitioner's patient.

The Board concluded that petitioner "failed to keep adequate records on many of his patients including, but not limited to, patient histories, examination and test results, and office visits. Specifically, by failing to maintain medical records for individuals identified as A.H., D.W. and J.S. while issuing prescriptions for controlled substances to these individuals," petitioner violated 24 C.S.R. § 1-18.1.21 (2001).[14]

---

The Board may deny an application for a license, place a licensee on probation, suspend a license, limit or restrict a license or revoke any license issued by the Board, upon satisfactory proof that the licensee has:

Delegated professional responsibilities to a person whom the licensee knew or had reason to know is not qualified by training, experience or licensure to perform the responsibilities[.]

[13] 24 C.S.R. § 1-18.1.29 (2001) states:

The Board may deny an application for a license, place a licensee on probation, suspend a license, limit or restrict a license or revoke any license issued by the Board, upon satisfactory proof that the licensee has:

Presigned blank prescription forms[.]

[14] 24 C.S.R. § 1-18.1.21 (2001) states:

(continued . . .)

<u>False Statements on Licensure Application</u>

The Board found that when petitioner applied for osteopathic licensure in West Virginia, in connection with information regarding an applicant's education, the application asked: "Have you ever been dropped, suspended, placed on probation, expelled or requested to resign from any school, college or university?" Upon answering the question in the negative, petitioner failed to report that he had, in fact, attended the Des Moines Medical School for one year and was asked to leave.[15]

The Board concluded that by failing to disclose that he attended and then left an osteopathic medical program and answering in the negative on his licensure application in connection therewith, petitioner "engaged in misrepresentation, falsehood, and deceit in procuring admission to practice in this state," in violation of West Virginia Code § 30-14-11(a)(4)[16] and 24 C.S.R. § 1-18.1.1 (2001) [17]

---

The Board may deny an application for a license, place a licensee on probation, suspend a license, limit or restrict a license or revoke any license issued by the Board, upon satisfactory proof that the licensee has:

Failed to keep written records justifying the course of treatment of the patient, including, but not limited to, patient histories, examination results and test results and treatment rendered, if any[.]

[15] Petitioner transferred to another osteopathic medical school and graduated.

[16] West Virginia Code § 30-14-11(a)(4) provides:

(a) The board may either refuse to issue or may suspend or revoke any license for any one or more of the following causes:

(4) Fraud, misrepresentation or deceit in procuring or attempting to procure admission to practice[.]

[17] 24 C.S.R §1-18.1.1 (2001) states:

The Board may deny an application for a license, place a licensee on probation, suspend a license, limit or restrict a license or revoke any license issued by the Board, upon satisfactory proof that the licensee has:

Knowingly made, or presented or caused to be made or presented, any false, fraudulent or forged statement, writing certificate, diploma or other material in connection with an application for a license.

Re-dispensing of Medications

Dr. Wendi Lundquist, who was previously employed by petitioner, filed a formal complaint with the Board against petitioner, alleging, in part, that petitioner stored and re-dispensed fentanyl patches and OxyContin. She claimed that, in 2005, while employed by petitioner, he advised her that it was a physician's duty to re-dispense returned medications to patients who could not afford them. In his response to the 2005 complaint, petitioner admitted accepting medications from patients who no longer took them, but claimed that he later destroyed them. He asserted that Dr. Lundquist may have seen these pills in a cabinet where he stored them away from patients until they could be destroyed. He denied re-dispensing these medications to other patients. The Board found that from 2005-2010, petitioner routinely accepted unused medications, including controlled substances, from patients and stored them, unsecured, for undetermined periods of time. The Board further found that petitioner "did re-dispense these medications to other patients and himself. After Dr. Weixler [his former partner] left [the practice], [petitioner] routinely took medications to his home."

The Board concluded that petitioner violated 24 C.S.R. § 1-18.1.5 "by making a false statement to the Board . . . regarding [petitioner's] habit and method of securing and/or disposing of controlled substances and re-dispensing controlled substances to patients." The Board further concluded that petitioner violated 24 C.S.R. § 1-18.1.10 "by knowingly retaining prescription controlled substances returned to him by patients and by knowingly diverting such controlled substances for [his] own use[.]"

Standard of Review

This Court has established the following guidelines to be followed by circuit courts in reviewing decisions of administrative agencies such as the West Virginia Board of Osteopathic Medicine:

"'Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law, or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."' Syllabus point 2, *Shepherdstown Volunteer Fire Department v. West Virginia Human Rights Commission,* 172 W.Va. 627, 309 S.E.2d 342 (1983)."

Syl., *Berlow v. W.Va. Bd. of Med.,* 193 W.Va. 666, 458 S.E.2d 469 (1995).

We further explained in *Modi v. West Virginia Bd. of Med.,* 195 W.Va. 230, 239, 465 S.E.2d 230, 239 (1995) that

> findings of fact made by an administrative agency will not be disturbed on appeal unless such findings are contrary to the evidence or based on a mistake of law. In other words, the findings must be clearly wrong to warrant judicial interference. . . . Accordingly, absent a mistake of law, findings of fact by an administrative agency supported by substantial evidence should not be disturbed on appeal.

*Id.* at 239, 465 S.E.2d at 239 (citations omitted). *See also Martin v. Randolph Cnty. Bd. of Educ.,* 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995) (explaining that "[w]e must uphold any of the [administrative agency's] factual findings that are supported by substantial evidence, and we owe substantial deference to inferences drawn from these facts"). Thus, "this Court reviews the decision[] of the circuit court under the same standard of judicial review that the lower court was required to apply to the decision of the administrative agency." *Webb v. W.Va. Bd. of Med.,* 212 W.Va. 149, 155, 569 S.E.2d 225, 231 (2002).

We first address petitioner's argument that the Board's decision to revoke his license to practice osteopathic medicine and surgery was against the manifest weight of the evidence. Petitioner argues that, with regard to his treatment of Patients 1 through 8, and Patients 10 and 11, he presented expert testimony that indicated that his actions were appropriate and within the applicable standard of care. Petitioner contends that his expert, Dr. John Hart, also opined that there was nothing petitioner could have done to have prevented the deaths of Patients 1 through 7.

With regard to Patient 1, petitioner specifically argues that Patient 1 was known to steal medications and medical equipment from previous employers and hospitals and that, as a nurse anesthetist in his employ, she had legitimate access to the locked drug safe in his office.

As for Patient 2, petitioner argues that the post-mortem drug screen of this patient revealed that psychiatric medications not prescribed by petitioner were present at levels of more than 100 times the legal level and that the pain medicine petitioner prescribed for her was present at a level that could only cause respiratory depression.

With regard to Patient 3, petitioner argues that his expert, Dr. Hart, testified that the patient's death was caused by a heroin overdose "without any medications prescribed by" petitioner and that the Board could have reviewed the patient's medical records after they were returned to the Drug Enforcement Administration ("DEA").[18]

As for Patient 4, petitioner argues that, according to Dr. Hart's expert testimony, closer monitoring of Patient 4 would not have shown that he was diverting his prescribed medication,

---

[18] We note that petitioner does not aver that a review of Patient 3's medical records would have rebutted the Board's finding that petitioner failed to adequately monitor Patient 3's use of controlled substances prescribed by petitioner.

as found by the Board. Dr. Hart further opined that petitioner prescribed controlled substances for this patient in conservative amounts.

With regard to Patient 5, petitioner argues that although petitioner increased the patient's methadone prescription, other prescription medications were discontinued altogether, thus resulting in "a lower equivalent dose than the patient had been taking upon arrival into the practice." Petitioner argues that the documentary evidence showed that, contrary to the Board's findings, Patient 5's initial paperwork showed that he was current with certain medications, as evidenced by the post-mortem drug screen, which indicated that there was a measurable amount of his previous medication in his system at the time of his death even though petitioner "had clearly discontinued the previous medicines." Petitioner also disputes the finding that he caused Patient 5's death. To the contrary, petitioner argues that Patient 5's death was caused by his mother's "withholding [of] critical doses of other medication that would have prevented seizure and/or cardiac electrical rhythm disturbances."

With regard to Patients 6 and 7, petitioner argues that Dr. Hart opined that these patients snorted their medications and that petitioner could not have predicted or prevented these patients from misusing their medications in this way. Petitioner argues that Patient 6 had not previously strayed from his history of complying with petitioner's medical directions.

With regard to Patient 8, petitioner argues that he co-treated this patient, an osteopathic physician, with the Kentucky Board of Medical Licensure and that, if petitioner violated the standard of care regarding the monitoring of Patient 8, then so did the Kentucky Board. Furthermore, petitioner argues that the Board could have reviewed Patient 8's records that were seized and then returned by the DEA.[19]

As for Patient 10, petitioner denies that he had a "romantic" relationship with her but, instead, avers that he had only a one-time sexual encounter with her. He further denies that Patient 10 was under his care at the time the sexual encounter occurred. Petitioner admitted that Patient 10 stayed in his home for several weeks, testifying that she did so in order to act as his caregiver after he sustained a spinal cord injury following a plane crash. Furthermore, petitioner denied that he injected Patient 10 with controlled substances because "[n]arcotic injections are simply not part of [his] practice."

With regard to Patient 11, petitioner denies that he had a romantic relationship with her and argues that drug screens and pill counts were not indicated for her.

Petitioner also argues that, with regard to the medications prescribed for other patients that were found in his luggage during the airport incident, he took these medications—which had been returned to him by patients—to Florida because he did not feel that they could be safely stored at his office. He argues that he intended to incinerate the medications at his home upon his

---

[19] We note that, as with his argument regarding Patient 3, petitioner does not aver that a review of Patient 8's records by the Board would have revealed that petitioner adequately monitored this patient's progress and use of controlled substances.

12

return to West Virginia. Petitioner avers that no charges were ever filed by the DEA in connection with this incident.

With regard to the pre-signed prescription pads, petitioner denies that he pre-signed prescriptions on a routine basis but, instead, claims that physicians who covered for him would issue "routine prescription refills" for patients in his absence. Petitioner admits that he pre-signed a few emergency prescriptions that he kept locked-up and that, when contacted by his nurse practitioner, he would approve the prescription by telephone. Petitioner contends that, at the time, this was common practice and that there were no rules prohibiting the pre-signing of prescription forms.

With regard to his alleged failure to maintain patient records, petitioner argues that the DEA had possession of his older, paper records and that these records were later made available to the Board. Petitioner contends that he should not be held responsible for the unavailability of records that were not in his possession when the Board's subpoena was issued. Petitioner further argues that his office maintained records for A.H., D.W., and J.S. in a separate, secured location because J.S. was his employee, and A.H. and D.W. were the parents of Patient 1, who had also been employed by petitioner. Petitioner avers that these records were either "removed" or "stolen" when two of his employees left employment.

With regard to the false statements made by petitioner on his licensure application, petitioner argues that, it is undisputed that his former wife, Dr. Weixler, completed the application on his behalf and that he never saw it. He further contends that he voluntarily transferred from the first medical school due to an "adversarial relationship" that had developed between his brother and the "Optometry Association." He avers that no false statements were made on the licensure application.

Finally, with regard to the re-dispensing of medications, petitioner argues that Dr. Lundquist, a disgruntled former employee, had previously filed a complaint with the Board and that the Board summarily dismissed her claims. He further disputes the finding that he used medications returned to him by patients. Petitioner points to a year-long drug screening process to which he submitted himself "prior to the Board allegations and DEA investigation" and the drug test he was given in the emergency room after his plane crash. He avers that he tested negative each time.[20]

Having carefully considered petitioner's arguments and the record below, we find the Board's findings and conclusions as set forth above to be well-supported by the evidence presented at the suspension and revocation hearings.[21] As a reviewing court, we are "obligated to

---

[20] Petitioner admits that he transported medications from his office to the "substantial safe" located on his farm and claims that he eventually incinerated the medications at the farm.

[21] Following a hearing on the admissibility of the suspension record, the hearing examiner for the revocation hearing ruled that the suspension hearing transcript and exhibits (continued . . .)

give deference to factual findings rendered by an administrative law judge[;]" thus, like the circuit court, we are "not permitted to substitute [our] judgment for that of the hearing examiner with regard to factual determinations." Syl. Pt. 1, in part, *Cahill v. Mercer Cnty. Bd. of Educ.*, 208 W.Va. 177, 539 S.E.2d 437 (2000). Furthermore "[w]e must uphold any of the [administrative agency's] factual findings that are supported by substantial evidence, and we owe substantial deference to inferences drawn from these facts[.]" *Webb*, 212 W.Va. at 155, 569 S.E.2d 231.

It is clear that a majority of petitioner's arguments—that the Board's findings of fact are against the manifest weight of the evidence—are based upon the implication that his evidence was more credible and should carry greater weight than the Board's. However, this Court has made clear that "[c]redibility determinations are properly made by the trier of fact, in this case the administrative law judge, who has had the opportunity to observe, first hand, the demeanor of the witness. *Miller v. Chenoweth*, 229 W.Va. 114, 121, 727 S.E.2d 658, 665 (2012). *See also Webb,* 212 W.Va. at 156, 569 S.E.2d at 232 (stating that "credibility determinations by the finder of fact in an administrative proceeding are 'binding unless patently without basis in the record.' *Martin v. Randolph County Bd. of Educ.,* 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995)."); *Michael D.C. v. Wanda L.C.,* 201 W.Va. 381, 388, 497 S.E.2d 531, 538 (1997) (observing that "[a] reviewing court cannot assess witness credibility through a record."). Upon careful review of the record before us, we find that petitioner has failed to demonstrate that the Board's findings were clearly wrong or otherwise contrary to the evidence.

Next, petitioner argues that the Board erred in admitting the testimony of one of its experts, Dr. Jason Pope, a multi-disciplinary pain physician. More specifically, petitioner argues that Dr. Pope was not qualified to testify with regard to the relevant standard of care because the events herein transpired prior to Dr. Pope's practice in the field of pain management and, further, Dr. Pope admitted that he had failed to do any research on the standard of care in place during that time.

Specifically, petitioner argues that Dr. Pope's qualifications do not comport with the criteria set forth in the Medical Professional Liability Act ("MPLA"), which provides that "there shall be a rebuttable presumption that the witness is qualified as an expert" only if the foundation for his or her testimony is laid as set forth by the six statutory criteria, *and* if the witness "devoted, *at the time of the medical injury*, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty . . . ." W.Va. Code § 55-7B-7(a), in relevant part.[22] (Emphasis added).

---

would be admitted in the revocation proceedings and that the parties could supplement or highlight information as needed.

[22] West Virginia Code § 55-7B-7(a) states as follows:

> The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent

(continued . . .)

14

It is petitioner's contention that Dr. Pope should not have been qualified to testify as an expert in this case because he was not practicing in the field of pain management at the time some of the events herein occurred (e.g., Patient 2 died in 2004).[23]

Assuming, *arguendo*, that West Virginia Code § 55-7B-7(a) applies to the administrative disciplinary proceeding now at issue, we find petitioner's argument to be without merit. Rule 702 of the West Virginia Rules of Evidence, Testimony by Expert Witnesses, states, in pertinent part, as follows:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

With regard to Rule 702, we have stated that, "to qualify a witness as an expert on th[e] standard of care, the party offering the witness must establish that the witness has more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in the defendant's specialty . . . ." *Mayhorn v. Logan Med. Found.,* 193 W.Va. 42, 49-

---

expert witnesses if required by the court. A proposed expert witness may only be found competent to testify if the foundation for his or her testimony is first laid establishing that: (1) The opinion is actually held by the expert witness; (2) the opinion can be testified to with reasonable medical probability; (3) the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (4) the expert witness's opinion is grounded on scientifically valid peer-reviewed studies if available; (5) the expert witness maintains a current license to practice medicine with the appropriate licensing authority of any state of the United States: *Provided,* That the expert witness's license has not been revoked or suspended in the past year in any state; and (6) the expert witness is engaged or qualified in a medical field in which the practitioner has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient. If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or specialty in an accredited university, there shall be a rebuttable presumption that the witness is qualified as an expert. The parties shall have the opportunity to impeach any witness's qualifications as an expert. Financial records of an expert witness are not discoverable or relevant to prove the amount of time the expert witness spends in active practice or teaching in his or her medical field unless good cause can be shown to the court.

[23] On appeal, petitioner does not argue that Dr. Pope failed to satisfy the six enumerated criteria set forth in West Virginia Code § 55-7B-7(a).

50, 454 S.E.2d 87, 94-95 (1994). Thus, there is a two-step inquiry in determining who qualifies as an expert: First, the tribunal "must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact." Second, the tribunal "must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify." Syl. Pt. 5, in part, *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995).

Importantly, this Court has stated that Rule 702 "provides the test for determining whether an expert's testimony is admissible[,]" *Mayhorn*, 193 W.Va. at 46, 454 S.E.2d at 91, and "does not provide that the legislature may outline when a witness should be found to be qualified as an expert." *Id.* at 49, 454 S.E.2d at 94. Thus, in syllabus point six of *Mayhorn*, we held that

> Rule 702 of the *West Virginia Rules of Evidence* is the paramount authority for determining whether or not an expert is qualified to give an opinion. Therefore, to the extent that *Gilman v. Choi,* 185 W.Va. 177, 406 S.E.2d 200 (1990) indicates that the legislature may by statute determine when an expert is qualified to state an opinion, it is overruled.

*Mayhorn*, 193 W.Va. at 44, 454 S.E.2d at 89. *See Id.* at 49, 454 S.E.2d at 94 (stating that "[t]his Court has complete authority to determine an expert's qualifications pursuant to its constitutional rule-making authority."); Syl. Pt. 7, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994) (holding that "[t]he West Virginia Rules of Evidence remain the paramount authority in determining the admissibility of evidence in circuit courts. These rules constitute more than mere refinement of common law evidentiary rules, they are a comprehensive reformulation of them."). Thus, "[w]e . . . must look to Rule 702, and not *W.Va.Code,* 55–7B–7 [1986], to determine whether [the proposed expert] was qualified to give an opinion." *Dolen v. St. Mary's Hosp. of Huntington, Inc.*, 203 W.Va. 181, 186, 506 S.E.2d 624, 629 (1998).

Furthermore, "'[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.' Syl. pt. 6, *Helmick v. Potomac Edison Co.,* 185 W.Va. 269, 406 S.E.2d 700 (1991)." *Mayhorn*, 193 W.Va. at 43, 454 S.E.2d at 88, syl. pt. 1.

In the present matter, the Board found Dr. Pope to be qualified to testify as an expert regarding the standard of care in the field of pain management. The evidence revealed that, following Dr. Pope's graduation from medical school in 2004, he completed a residency in anesthesiology in 2008 and, during his third year of residency, he began training in interventional and pain management. He became an American Board of Anesthesiology Diplomat of Pain Medicine in October of 2010. Between 2008 and 2009, Dr. Pope worked in interventional pain management in a Veteran's Administration hospital and completed a fellowship in pain management at the Cleveland Clinic in 2010; during that time, he was pain management associate staff at the Cleveland Clinic's Anesthesia Institute. From January 2011 through August 2012, Dr. Pope worked as a physician and the Director of the Headache Center in California and, at the time of the Board's decision herein, was the Medical Director at the Center for Pain Relief in Charleston and Teays Valley, West Virginia. Based upon all of the above, we find no error in

the Board's ruling that Dr. Pope was qualified to provide expert testimony as to the standard of care in the field of pain management.[24]

In his next assignment of error, petitioner argues that the Board was "improperly convened" and "without authority" to take action on petitioner's license. West Virginia Code § 30-14-3 provides, in relevant part, that

(a) The West Virginia Board of Osteopathy is continued and effective July 1, 2012 shall be known as the West Virginia Board of Osteopathic Medicine. The members of the board shall continue to serve until a successor is appointed and may be reappointed.
(b) The Governor shall appoint, by and with advice and consent of the Senate, two additional members and stagger their initial terms:
(1) One person who is a licensed osteopathic physician or surgeon; and
(2) One person who is a licensed osteopathic physician assistant.
(c) The board consists of the following seven members, who are appointed to staggered terms by the Governor with the advice and consent of the Senate:
(1) Four licensed osteopathic physicians and surgeons;
(2) One licensed osteopathic physician assistant; and
(3) Two citizen members, who are not associated with the practice of osteopathic medicine.

Without any citation to the record, supporting facts, or assertion that this assignment of error was raised before the circuit court, petitioner argues simply that, at all times relevant "the board had 3 Osteopathics not 4, had 2 lay members and no Physician's assistant, [sic] for those reasons the board is improperly convened and without authority to take action in this matter." For its part, the Board states that, before July 1, 2012, the Board was comprised of five members—three members were osteopathic physicians and two members were citizens who were not associated with the practice of osteopathic medicine. According to the Board, after July 1, 2012, the five members continued to serve the remainder of their terms and, on January 1,

_____

[24] Petitioner also assigns as error the Board's refusal to admit the testimony of expert Dr. Thomas Gilligan on the applicable standard of care "when not only had he practiced in the field but had at the time of the events alleged he was on the Board of Osteopathic Medicine in charge of reviewing complaints made against osteopathic physicians." Petitioner's assertion fails to include any substantive argument, supporting facts, or citation to the record. As we stated in *State, Dept. of Health v. Robert Morris N.,* 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995), "'[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.'" (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)). *See State v. Lilly*, 194 W.Va. 595, 605 n.16, 461 S.E.2d 101, 111 n.16 (1995) (noting that "appellate courts frequently refuse to address issues that appellants . . . fail to develop in their brief."). *See also Ohio Cellular RSA Ltd. P'ship v. Bd. of Pub. Works of West Virginia*, 198 W.Va. 416, 424 n.11, 481 S.E.2d 722, 730 n.11 (1996) (refusing to address issue on appeal that had not been adequately briefed). Thus, we decline to address this assignment of error.

2013, Dr. Michael Muscari, D.O. was appointed to the Board while in March 2013, Heather Jones, PA-C, was appointed. The Board avers that the Board was properly convened with all seven members when it voted to revoke petitioner's license to practice osteopathic medicine and surgery.

This Court has previously declared that

"[a]n appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment." Syllabus Point 5, *Morgan v. Price,* 151 W.Va. 158, 150 S.E.2d 897 (1966).

Syl. Pt. 2*, West Virginia Dep't of Health & Human Res. Emp. Fed. Credit Union v. Tennant*, 215 W.Va. 387, 599 S.E.2d 810 (2004). Given petitioner's failure to present any facts in support of his assignment of error on appeal, we conclude that he has failed to carry his burden of showing that the Board was not properly convened during the proceedings in this case.

Next, petitioner argues that the Board should have granted his request for a neutral, unbiased hearing officer to conduct the revocation proceedings in this case. Petitioner argues that he offered to pay the costs associated with hiring a "retired Circuit judge or equivalent" and that such a request was reasonable. He contends that it is inherently unfair and a violation of his right to due process to allow the Board to prosecute this matter and to also select the hearing examiner. We find no error.

In selecting a hearing examiner to preside over petitioner's revocation proceeding, the Board complied with 25 C.S.R. § 3-3.10.10, which states that "[t]he hearing may be conducted by one or more Board members or by a hearing examiner appointed by the Board." Petitioner points to no supporting legal authority that would authorize his request for an alternative hearing officer. Furthermore, petitioner fails to make a specific complaint against the hearing examiner or otherwise point to any instance during the proceedings in which, in his view, she acted unfairly or with bias. As previously stated, error will not be presumed but, to the contrary, "all presumptions [will be] in favor of the correctness of the judgment." *Tennant*, 215 W.Va. at 389, 599 S.E.2d at 812, syl. pt. 2, in part. Therefore, we find petitioner's argument that he should have been permitted to hire an "unbiased" hearing officer to be without merit.

Finally, petitioner argues that the Board exceeded its statutory authority in revoking his license to practice osteopathic medicine and surgery in West Virginia. Petitioner contends that West Virginia Code § 30-14-11 sets forth the reasons for which the Board may suspend or revoke a license and that none of the stated reasons apply in this case. West Virginia Code § 30-14-11 states, in relevant part, as follows:

(a) The board may either refuse to issue or may suspend or revoke any license for any one or more of the following causes:
(1) Conviction of a felony, as shown by a certified copy of the record of the trial court;
(2) Conviction of a misdemeanor involving moral turpitude;

18

(3) Violation of any provision of this article regulating the practice of osteopathic physicians and surgeons;

(4) Fraud, misrepresentation or deceit in procuring or attempting to procure admission to practice;

(5) Gross malpractice;

(6) Advertising by means of knowingly false or deceptive statements;

(7) Advertising, practicing or attempting to practice under a name other than one's own;

(8) Habitual drunkenness, or habitual addiction to the use of morphine, cocaine or other habit-forming drugs.

Petitioner argues that only the provisions regarding fraud, misrepresentation, or deceit in procuring admission to practice; gross malpractice; or habitual addiction to habit-forming drugs, could potentially apply in this case. Petitioner further argues that the evidence fails to satisfy any of those grounds and, thus, the Board exceeded its authority in revoking his osteopathic license.

First, the Court does not agree that the evidence fails to satisfy West Virginia Code § 30-14-11(a)(4), (5), or (8). At the very least, the evidence demonstrates that petitioner's violations of the applicable standard of care contributed to or directly resulted in the deaths of seven patients. Moreover, petitioner does not deny that he failed to advise the Board on his application for licensure that he attended, and then left, an osteopathic medical school after one year. Furthermore, the reasons for the suspension or revocation of a license of an osteopathic physician are not limited to those set forth in West Virginia Code § 30-14-11. Additional causes for the the denial, probation, limitation, discipline, suspension, or revocation of licenses of osteopathic physicians are set forth in 24 C.S.R. § 1-18, and, as previously and extensively discussed herein, the Board correctly concluded that the evidence presented established that petitioner violated various provisions of the rule, thereby warranting revocation of his osteopathic medical license. Thus, we conclude that the Board acted well within its statutory authority in suspending and ultimately revoking petitioner's license to practice osteopathic medicine and surgery in West Virginia.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 3, 2016

**CONCURRED IN BY:**

Chief Justice Menis E. Ketchum
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Allen H. Loughry II

19