# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Fall 2025 Term

_____

No. 24-ICA-438

_____

FILED

**November 12, 2025**

released at 3:00 p.m.
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

SCOTT LEMLEY,

In his official capacity as Assessor of Wetzel County, West Virginia,
Respondent Below, Petitioner

v.

MARKWEST LIBERTY MIDSTREAM & RESOURCES, LLC,
MARKWEST LIBERTY ETHANE PIPELINE, LLC, and
MARKWEST LIBERTY NGL PIPELINE, LLC,
Petitioners Below, Respondents

_____

Appeal from the Office of Tax Appeals

Docket No. 23-1355

AFFIRMED

_____

Submitted: September 3, 2025

Filed: November 12, 2025

Caleb B. David, Esq.
Charleston, West Virginia
Michael D. Dunham, Esq.
Winchester, Virginia
Counsel for Petitioner

Craig A. Griffith, Esq.
Alex J. Zurbuch, Esq.
Charleston, West Virginia
Counsel for Respondents

JUDGE GREEAR delivered the Opinion of the Court.

GREEAR, Judge:

Petitioner Scott Lemley, in his capacity as Assessor of Wetzel County, West Virginia ("Assessor") appeals the October 9, 2024, Final Decision of the Office of Tax Appeals ("OTA") reducing the assessed value of property, namely three 20" natural gas pipelines, owned by Respondent MarkWest Liberty NGL Pipeline, LLC ("MarkWest").[1] On appeal, the Assessor argues that OTA erred in a number of ways related to its reduced valuation of the MarkWest pipelines, including OTA's application of a 35% economic obsolescence[2] reduction in assessed value. In response to the Assessor's appeal, MarkWest argues, in a cross-assignment of error, that OTA erred in determining that only one method used by MarkWest's expert was valid under West Virginia law.

Based on our review of this matter, we find no error in OTA's decision to apply a 35% reduction to the assessed value of the property at issue for economic obsolescence, as the record contains no legal or factual basis to disturb OTA's decision in this regard. As to MarkWest's cross-assignment of error regarding OTA's rejection of

---

[1] MarkWest Liberty Midstream & Resources, LLC, MarkWest Liberty Ethane Pipeline, LLC, and MarkWest Liberty NGL Pipeline, LLC were Petitioners below; however, MarkWest Liberty Midstream & Resources, LLC, and MarkWest Liberty Ethane Pipeline, LLC withdrew their appeals before OTA. As a result, only MarkWest Liberty NGL Pipeline, LLC is subject to this appeal.

[2] The West Virginia Legislature, in 110 W. Va. C.S.R. § 1P-2.2.5 (2013), defines economic obsolescence as "a loss in value of property arising from outside forces such as changes in use, legislation that restricts or impairs property rights, or changes in supply and demand relationships."

1

methodologies used by MarkWest's expert, we decline to address this argument, as the same would require this Court to render an advisory opinion, for which this Court has no authority. Accordingly, we affirm the October 9, 2024, Final Decision of OTA.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

MarkWest owns a number of natural gas liquid ("NGL") pipelines located throughout West Virginia. MarkWest's NGL pipelines run from a processing plant in Sherwood, Doddridge County, to a processing plant in Mobley, Wetzel County, then continue to a plant in Fort Beeler/Majorsville, Marshall County. From Marshall County, the NGLs are then transported either to Pennsylvania or Ohio.

Built in 2012, MarkWest's initial NGL pipelines in Wetzel County were 8"/10" in diameter. In 2015, MarkWest completed construction of 12" pipelines to handle its NGL service. Once these larger pipelines came into service, the original 8"/10" pipelines were converted to ethane service lines. In 2018, MarkWest began construction of 20" pipelines, which it deemed necessary to accommodate anticipated additional volume for its NGL service in the future. The 20" pipelines are currently used for MarkWest's NGL service and are identified in Wetzel County tax records as Account Nos. 00025826, 00025827, and 00025828. The proper assessment of the Wetzel County portion of these pipelines, considered commercial personal property for ad valorem property tax purposes, is at issue in this appeal.

In August of 2022, MarkWest filed its commercial personal property tax returns for property tax year 2023.[3] MarkWest calculated the property value of the three 20" pipelines based upon the cost minus depreciation valuation method of valuing commercial property, set forth in West Virginia Code of State Rules § 110-1P-3 (2013), but further contained a reduction for economic obsolescence based on inutility.[4] MarkWest's valuation resulted in a difference in disputed values (Assessor value minus MarkWest value) of $13,748,386, $7,633,988, and $10,919,604 for the respective pipelines.[5] [6]

---

[3] These returns contained MarkWest's appraised and assessed property values for the property at issue as follows:

> Account No. 00025826: 20-inch Sherwood to Mobley 10.084mi, appraised value $26,899,016, assessed value $16,139,410.

> Account No. 00025827: 20-inch Mobley to Cameron Ridge 5.925mi, appraised value $16,193,308, assessed value $9,715,985.

> Account No. 00025828: 20-inch Mobley to Cameron Ridge 8.557mi, appraised value $23,162,797, assessed value $13,897,678.

[4] Generally, MarkWest claimed that there was a throughput deficiency for its 20" pipelines, in that such lines have not reached full 100% design capacity.

[5] The Assessor's appraised and assessed values for these accounts were as follows:

> Account No. 00025826: 20-inch Sherwood to Mobley 10.084mi, appraised value $49,812,993, assessed value $29,887,796.

> Account No. 00025827: 20-inch Mobley to Cameron Ridge 5.925mi, appraised value $28,916,622, assessed value $17,349,973.

> Account No. 00025828: 20-inch Mobley to Cameron Ridge 8.557mi, appraised value $41,362,137, assessed value $24,817,282.

[6] At the hearing below, the Assessor testified that upon receipt of MarkWest's returns in 2023, the Assessor's office

Following the disputed assessment, MarkWest advised the Assessor that it would provide an expert report to justify the reduced valuations noted in its tax returns. By e-mail dated December 13, 2022, MarkWest requested that the Assessor consider economic obsolescence when valuing the pipelines and sent the Assessor an *Obsolescence Analysis*, prepared by KE Andrews (a consulting firm hired by MarkWest), and certified by KE Andrews' Vice President, Daniel Kistler ("KE Andrews Report"). The KE Andrews Report utilized four methodologies to ascertain loss in value of the subject pipelines.

By letter dated January 30, 2023, the Assessor denied MarkWest's request for reduction based on economic obsolescence. The Assessor based his decision, in part, "on his belief that the throughput deficiencies" MarkWest "complained of were not a form of economic obsolescence." Further, the Assessor noted that MarkWest did not provide any information to demonstrate that external forces caused the "alleged throughput deficiencies or that the throughputs are deficient at all." In his letter to MarkWest, the Assessor attached reports prepared by experts Lisa Hobart of Lisa Hobart, LLC ("Hobart

---

looked at the reported acquisition costs, trended those costs up according to trend tables provided by the State to arrive at a replacement cost new, and depreciated those trended values down according to the depreciation tables provided by the State to arrive at a replacement cost new less depreciation, which [the Assessor] testified is the true and actual fair market value for commercial personal property.

Report") and Jerry Wisdom of Total Assessment Solutions Corp. ("Wisdom Reports"[7]) which supported his position.

On February 7, 2023, MarkWest appealed the Assessor's decision to OTA. Evidentiary hearings were held before OTA on October 25, 2023, and January 10, 2024.[8] At the evidentiary hearings, MarkWest argued that construction on the 20" pipelines was intended to address an expected increase in production that never materialized due to the economic downturn caused by the COVID-19 pandemic and ultimately resulted in inutility.[9] In support of its arguments, MarkWest submitted the KE Andrews Report and the testimony of Mr. Kister. Conversely, the Assessor argued that his assessments on the three MarkWest pipelines were accurate in that he had appropriately rejected MarkWest's requested reduction for economic obsolescence. In support of his position, the Assessor

---

[7] Jerry Wisdom ultimately produced two reports during the underlying proceeding. The First Wisdom Report, dated December 13, 2022, was prepared in response to the KE Andrews Report. The Second Wisdom Report was prepared during the period of time following the evidentiary hearing in October of 2023 and continuation of that hearing in January of 2024.

[8] After the filing of post-hearing briefs, the record before OTA was closed on May 6, 2024. However, ten days later, on May 16, 2024, the record was briefly reopened at the request of the Assessor, but was closed again by OTA on June 5, 2024.

[9] Specifically, MarkWest suggested that "[t]he onset of the COVID-19 pandemic in 2020, and related economic slowdown, led to a shift in the oil and gas industry, with producers slowing their production of natural gas." Moreover, during the evidentiary hearing, it was noted that MarkWest was "forced to scale back construction of processing facilities, also due to COVID[-19])."

submitted the Hobart and Wisdom Reports, along with the accompanying testimony of Ms. Hobart and Mr. Wisdom.

On October 9, 2024, OTA issued its Final Decision applying a 35% reduction in the assessed value of the pipelines at issue due to economic obsolescence. While acknowledging the dispute of the parties as to the alleged underutilization of these pipelines, OTA determined that the evidence and testimony presented during the evidentiary hearings, when taken in their entirety, established that the 20" pipelines in question were underutilized and "suffered" throughput deficiencies as of the July 1, 2022, assessment date.[10] Further, OTA concluded that "[t]hese throughput deficiencies were the result of changes in the supply and demand relationships between the property owner and its customers, brought about by the economic downturn from COVID[-19]." The lessened demand for the "NGLs traveling though [MarkWest]'s pipelines [per OTA]   . . . caused investors to pull back, and demand that producers reallocate profits from seeking more reserves to providing a greater return to the investors." Ultimately, OTA determined that MarkWest submitted credible evidence of economic obsolescence, and that the Assessor failed to meet his burden of production to rebut MarkWest's evidence.[11] As a result, OTA

---

[10] Respectively, OTA determined that the three 20" pipelines at issue were utilized at only 28%, 36%, and 47% of their design capacity.

[11] OTA clarified that MarkWest was

not asking the Assessor to lower its pipeline valuations because of fluctuations in the price of natural gas. Nor is it arguing that it did not make as much profit in any given year. Again, it is arguing that on July 1, 2022, a

directed that the Assessor's assessed values for the pipelines at issue be modified to reflect a 35% economic obsolescence reduction. It is from OTA's October 9, 2024, decision that the Assessor now appeals.

## II.    STANDARD OF REVIEW

A decision made by OTA may be appealed to this Court.[12] The appellate standard of review for such decisions is as follows:

> In an administrative appeal from the decision of the West Virginia Office of Tax Appeals, this Court will review the final order of the circuit court pursuant to the standards of review in the State Administrative Procedures Act set forth in W. Va. Code § 29A-5-4(g) [2021]. Findings of fact of the administrative law judge will not be set aside or vacated unless clearly wrong, and, although administrative interpretation of State tax provisions will be afforded sound consideration, this Court will review questions of law *de novo*.

Syl. Pt. 1, *Griffith v. ConAgra Brands, Inc.*, 229 W. Va. 190, 728 S.E.2d 74 (2012); *accord Far Away Farm, LLC v. Jefferson Cnty. Bd. of Zoning Appeals*, 222 W. Va. 252, 256, 664 S.E.2d 137, 141 (2008) (quoting *Webb v. W. Va. Bd. of Med.*, 212 W. Va. 149, 155, 569 S.E.2d 225, 231 (2002) ("[i]t is well-established that '[o]n appeal, this Court reviews the

_____

willing buyer would pay it less [for the pipelines] than the cost minus depreciation value assigned by the Assessor, because of a change in the supply and demand relationship between it and the natural gas producers.

[12] Beginning tax year 2023, final decisions of OTA are appealable to the Intermediate Court of Appeals of West Virginia pursuant to West Virginia Code §§ 11-10A-19 and 51-11-4(b)(4) (2022).

decisions of the circuit court under the same standard of judicial review that the lower court was required to apply to the decision of the administrative agency.'"); *W. Va. Dep't of Health and Human Res. v. Downs-Jamal*, No. 22-ICA-129, 2023 WL 4027502, at \*3 (W. Va. Ct. App. June 15, 2023) (memorandum decision) (applying the same standard of review as the circuit court upon our review of its order following an appeal of an administrative decision).

West Virginia Code § 29A-5-4(g) (2021) provides:

The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority or jurisdiction of the agency;
(3) Made upon unlawful procedures;
(4) Affected by other error of law;
(5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an [administrative] agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 2, *Antero Res. Corp. v. Steager*, 244 W. Va. 81, 851 S.E.2d 527 (2020) (citing Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996)). "[A]n appellate court is required to give deference to an

8

administrative decision unless it is clearly wrong." *Patricia W. v. W. Va. Dep't of Health and Human Resources*, No. 23-ICA-15, 2023 WL 7202664, at *3 (W. Va. Ct. App. Nov. 1, 2023) (memorandum decision) (citing Syl. Pt. 1, in part, *Muscatell v. Cline*, 196 W. Va. 588, 590, 474 S.E.2d 518, 520 (1996) ("findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.")); *see also NCP Belden, LLC v. Banks*, No. 24-ICA-491, 2025 WL 2237555 (W. Va. Ct. App. Aug. 6, 2025) (memorandum decision); *Morgantown Mall Assocs., LP v. Musick*, No. 24-ICA-449, 2025 WL 2237489 (W. Va. Ct. App. Aug. 6, 2025) (memorandum decision).

"If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is de novo." Syl. Pt. 3, in part, *Adkins v. Gatson*, 192 W. Va. 561, 453 S.E.2d 395 (1994). With these standards in mind, we now turn to the arguments on appeal.

## III. DISCUSSION

The Assessor raises seven assignments of error on appeal, each of which relate, in some way, to OTA's application of a 35% economic obsolescence reduction in the assessed value of the pipelines at issue and the authority and discretion of OTA. First, the Assessor argues that OTA erred by finding that the Assessor was required to do more than simply consider MarkWest's claim for economic obsolescence. Second, the Assessor asserts that OTA erred by not requiring MarkWest to appraise or otherwise provide an

opinion of value for its pipeline assets. Third, the Assessor contends that OTA erred by taking judicial notice "of the effect the COVID pandemic had on the U.S. economy" without facts showing the pandemic's effect on the natural gas liquids market or on MarkWest's income. The remaining assignments of error focus on OTA's acceptance and alleged misapplication of methodology-based conclusions. Specifically, the Assessor argues that OTA erred by accepting MarkWest's inutility or throughput deficiency argument and by relying upon MarkWest's expert's capitalization of income loss methodology.[13] In its cross assignment of error, MarkWest argues that OTA erred in determining that only one economic obsolescence method used by MarkWest's expert was valid under West Virginia law.

We begin our review of this matter with a general discussion of ad valorem property tax assessments of commercial property in West Virginia and an examination of recent changes to the dispute resolution process for challenges to such assessments. The West Virginia Constitution provides that "taxation shall be equal and uniform throughout the state, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law." W. Va. Const. Art. X, § 1. All property in West

---

[13] In this regard, the Assessor is critical of OTA's acceptance of MarkWest's expert's opinion, as it was "a blend of four methodologies, three of which were rejected by the OTA for not conforming to the laws of West Virginia" and conflicted with MarkWest's net book value as reported on FERC filings.

Virginia is required to "be assessed annually [at] its true and actual value[.]" W. Va. Code § 11-3-1 (2014).

In 1991, a legislative rule was promulgated for the valuation of commercial and industrial personal property. *See* W. Va. Code St. R. §§ 110-1P-1 to 110-1P-2 (1991). The rules were amended and expanded in 2013. However, in both versions of the rules, three approaches for the estimation of fair market value were identified as "(A) cost, (B) income, and (C) market."[14] West Virginia Code of State Rules § 110-1P-3.4.3.2 (2013) provided,

> [o]nce generated, consider the various estimates of value when estimating final value. Of the three (3) approaches to value, the cost approach may apply most consistently to machinery, equipment, furniture, fixtures, and leasehold improvements because of the availability of data. The market approach is used less frequently, principally due to a lack of meaningful sales. The income approach is not normally used because of the difficulty in estimating future net benefits to be derived except in the case of certain kinds of leased equipment.

The legislative rule further anticipates consideration of adjustments to valuations: "[w]hen physically inspecting commercial and industrial personal property for appraisal, three (3) types of depreciation should be considered: physical deterioration

---

[14] The cost approach involves the "replacement cost of improvements, less all types of depreciation, is added to a land value in determining an estimate of the fair market value for improved real property." W. Va. Code St. R. § 110-1P-2.4 (2013). The income approach involves the "discounting [of] an estimate of future income into an expression of present worth." W. Va. Code St. R. § 110-1P-2.12 (2013). The market approach involves the "process of examining sales data and translating the data into an estimate of present worth." W. Va. Code St. R. § 110-1P-2.17 (2013).

depreciation, economic obsolescence and functional obsolescence." W. Va. Code St. R. § 110-1P-3.4.3.3 (2013).

In 2012, the Supreme Court of Appeals of West Virginia ("SCAWV") addressed the Tax Commissioner's consideration of obsolescence adjustments in *Century Aluminum of W. Virginia, Inc. v. Jackson Cnty. Comm'n*, 229 W. Va. 215, 224-25, 728 S.E.2d 99, 108-09 (2012) (per curiam). In *Century Aluminum*, the SCAWV reasoned that

> [a]bsent from the legislative rule requiring the Tax Commissioner to consider functional and economic obsolescence is any directive regarding how the Tax Commissioner must go about 'considering' economic and functional obsolescence. *See* W. Va. C. S. R. § 110-1P-2.2.1.1 [1991]. Moreover, West Virginia Code of State Rules § 110-1P-2.2.1.1 [1991] does not require the Tax Commissioner to make any adjustment to the valuations made regarding property because of physical deterioration, functional obsolescence and economic obsolescence. Rather, all that is required of the Tax Commissioner in applying the cost approach to valuation is that the Tax Commissioner will think about or contemplate three types of depreciation: physical deterioration, functional obsolescence, and economic obsolescence.

Prior to January 1, 2023, county-level property tax assessment decisions were generally heard by county commissions, who sat as boards of equalization. Such proceedings were inherently deferential to the taxing jurisdiction, insofar as the property owner had the burden to prove the assessment was erroneous under a "clear and

12

convincing" evidence standard. Syl. Pt. 2, in part, *Western Pocahontas Properties, Ltd. v. Cnty. Comm'n of Wetzel Cnty.,* 189 W. Va. 322, 431 S.E.2d 661 (1993).[15]

However, in 2022, years after the SCAWV's ruling in *Century Aluminum*, the West Virginia Legislature ("Legislature") conferred jurisdiction over contested property tax matters to OTA for all appeals made after January 1, 2023.[16] *See* W. Va. Code § 11-3-25b (2022). In West Virginia Code § 11-10A-1 (2002), the Legislature specifically noted its intent to treat OTA as an "independent quasi-judicial agency separate and apart from the Tax Division to resolve disputes between . . . county assessors . . . and taxpayers" in order to "maintain public confidence in the state tax system."[17]

Pursuant to West Virginia Code §§ 11-3-25b(c) (2023) and 11-10A-10(b) (2021), all property tax appeals before OTA are heard de novo. It is during a de novo hearing that an evidentiary record is established, with an OTA Administrative Law Judge

---

[15] "It is a general rule that valuations for taxation purposes fixed by an assessing officer are presumed to be correct. The burden of showing an assessment to be erroneous is, of course, upon the taxpayer[.]" Syl. Pt. 1, *Berkeley Cnty. Council v. Govt. Props. Income Tr.*, LLC, 247 W. Va. 395, 880 S.E.2d 487 (2022); Syl. Pt. 7, *In re Tax Assessments Against Pocahontas Land Co.*, 172 W. Va. 53, 303 S.E.2d 691 (1983).

[16] OTA first began operations in 2003, at which time its jurisdiction was limited to specific types of state tax disputes. *See* W. Va. Code § 11-10-9. Here, there is no dispute that the tax assessment at issue in this matter was appealed after January 1, 2023, and that OTA had jurisdiction to hear and decide the matter in dispute.

[17] Accompanying such independence was the level of discretion necessary to allow for OTA to properly determine and resolve factually dependent matters.

("ALJ") serving as the factfinder. The burden of proof in such cases is on the property owner. Nonetheless, once the property owner and the Assessor have presented their cases in chief, it is within the providence of OTA to determine whether the burden of proof has been satisfied to provide relief from contested assessments. *See Antero Res. Corp. v. Steager*, 244 W. Va. 81, 851 S.E.2d 527 (2020).

Further, the Legislature determined, as set forth in West Virginia Code §§ 11-3-23a(e) (2022) and 11-10A-19(h) (2023), that "the standard of proof which a taxpayer must meet at all levels of review and appeal [for property tax valuation matters] shall be a preponderance of the evidence standard." Preponderance of the evidence has been defined by the SCAWV as "that degree of evidence that is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not." *Frazier v. Gaither*, 248 W. Va. 420, 425, 888 S.E.2d 920, 925 (2023). Once the property owner has presented its case in chief, the burden of production shifts to the Assessor to rebut the evidence submitted by the property owner.[18]

---

[18] The SCAWV has reasoned that "[w]hen a party has the burden of persuasion on an issue, that burden does not shift. The burden of production merely requires a party to present some evidence to rebut evidence proffered by the party having the burden of persuasion." *In re Tax Assessment of Foster Found.'s Woodlands Ret. Cmty.*, 223 W. Va. 14, 29, 672 S.E.2d 150, 165 (2008).

With regard to the admission of evidence during evidentiary hearings, the Legislature clarified that OTA "is not bound by the rules of evidence as applied in civil . . . courts of this state. The [OTA] may admit and give probative effect to evidence of a type commonly relied upon by a reasonably prudent person in the conduct of his or her affairs." West Virginia Code § 11-10A-10(c).   Thus, we acknowledge, as the Legislature has directed, that it is the province of OTA to review the disputed evidence submitted by parties before it and determine the propriety of any contested property tax assessments, like the assessments at issue herein. Further, we recognize the Legislature's intent to leave admissibility, credibility, and a determination of the weight of evidence in the evidentiary hearings before it to the discretion of OTA.

## A.     Economic Obsolescence

We begin our analysis with the joint consideration of the Assessor's first two assignments of error, dealing with the application of economic obsolescence and property valuation, which we will address together.[19] Here, the Assessor argues that OTA erred in

---

[19] In his second assignment of error, the Assessor alleges error related to MarkWest's failure to provide an appraisal or its opinion as to the valuation for the property at issue. The Final Decision of OTA does not speak particularly to this issue, but finds that MarkWest submitted credible evidence in support of its request for a reduced assessment, which we do not disturb on appeal. Accordingly, we find no error in this regard and agree that the evidence submitted by MarkWest during the evidentiary hearings was sufficient.

Further, we note that the record clearly indicates that MarkWest never challenged the Assessor's application of cost methodology, and underlying assigned value. The challenge was premised on the Assessor's failure to account for economic obsolescence under such cost methodology. As such, MarkWest was not required to submit a new

requiring more than the Assessor's mere consideration of MarkWest's claim for economic obsolescence and cited the SCAWV's interpretation of the 1991 version of Section 110-1P of the West Virginia Code of State Rules § 110-1P-3.4.3 (1991), which he contends requires the Assessor to simply "think about or contemplate three types of depreciation: physical deterioration, functional obsolescence, and economic obsolescence." *Berkeley Cnty. Council*, 247 W. Va. at 407, 880 S.E.2d at 499 (quoting *Century Aluminum of W. Virginia, Inc. v. Jackson Cnty. Comm'n,* 229 W. Va. 215, 224-25, 728 S.E.2d 99, 108-09 (2012) (per curiam) (citations omitted)). In the underlying case, the record establishes that the Assessor indicated, in his January 30, 2023, letter to MarkWest, that he had considered MarkWest's request for adjustments and the report prepared by KE Andrews and denied the request "because the Taxpayers have failed to show that alleged throughput deficiencies are a form of economic obsolescence."

While the Assessor argues that the exercise of his discretion in considering economic obsolescence claims will not be disturbed absent a showing of abuse of discretion, we disagree. *Id.* (quoting Syl. Pt. 5, *In re Tax Assessment Against American Bituminous Power Partners, L.P.*, 208 W. Va. 250, 539 S.E.2d 757 (2000)). Under the 2023 amendments to the West Virginia Code (changing the standard of proof for taxpayers

---

appraised value when its application of economic obsolescence applied to the assessed value under the cost approach. There is no requirement under West Virginia law that MarkWest's request for an adjustment due to economic obsolescence mandated an alternate appraisal of the property, and, thus, no error.

appealing an assessment from a clear and convincing standard of proof for taxpayers to a preponderance of the evidence standard), MarkWest was required to demonstrate, by a preponderance of the evidence, that an adjustment to its tax assessment to include economic obsolescence was warranted consistent with the standards for appraising commercial property. Whether evidence provided by MarkWest showing that the assessment was not supported was a decision to be made de novo by OTA.

In the evidentiary hearings before OTA, MarkWest cross-referenced the rated capacity of the subject pipelines and measured the actual utilization of the pipelines to arrive at an "inutility" percentage. Those calculations, which indicated that the pipelines at issue were being utilized well under their design capacity (at 28%, 36%, and 47%), were cited in the KE Andrews Report to demonstrate that an economic obsolescence reduction to the assessed value was necessary to fairly value the pipelines. Through testimony, MarkWest alleged that the throughput deficiencies of these pipelines were the result of changes in the supply and demand relationships between MarkWest and its customers, brought about by the economic downturn from COVID-19.

The KE Andrews Report utilized four (4) methods to calculate the amount of economic obsolescence. Those methods were the inutility method, the rate of return on capital method, the capitalization of income loss method, and the blue-chip method. OTA concluded that only the capitalization of income loss method could be considered an "income approach" as contained in the West Virginia Code of State Rules. Under this

17

methodology, the KE Andrews Report used publicly available information from the Federal Energy Regulatory Commission ("FERC") regarding MarkWest's cash flows, and then divided/capitalized it by an industry based weighted average cost of capital ("WACC"). From this WACC, the KE Andrews Report subtracted a growth rate (in the case of the pipelines at issue, the report estimated a 0% growth rate). Next, the capitalized cash flows were compared with FERC net value, to arrive at a 35% reduction attributable to economic obsolescence. OTA determined that MarkWest submitted sufficient evidence to satisfy its evidentiary requirement.

Thus, the Assessor was then required to rebut MarkWest's showing that the Assessor's determination of the fair market value required application of economic obsolescence and show that his refusal to account for economic obsolescence did not violate the standardized principles for appraising property.[20] The Assessor's rebuttal relied heavily on the opinions of his experts (Hobart and Wisdom), which OTA reviewed but deemed unpersuasive.

Specifically, OTA found that the Hobart Report failed to show any specific errors in the KE Andrews Report and that the contentions contained in such report ignored the plain language in West Virginia law that clearly mandates consideration of economic

---

[20] Here, the Assessor had the burden of production, which required him to "present some evidence to rebut evidence proffered by the party having the burden of persuasion." *In re Tax Assessment of Foster Found.'s Woodlands Ret. Cmty.*, 223 W. Va. 14, 29, 672 S.E.2d 150, 165 (2008).

18

obsolescence when such depreciation is a result of external forces acting upon the supply and demand for revenue generating the commercial and industrial activity. As to the Wisdom Report, OTA noted credibility concerns and indicated that the economic obsolescence calculations contained in the second Wisdom Report were of first impression to Mr. Wisdom and had not been previously utilized by him. Upon consideration of the evidence presented by both parties, OTA determined that said evidence established that the Assessor's failure to account for economic obsolescence was a deviation from accepted appraisal principles. OTA's credibility determination in this regard is afforded substantial weight, as during the de novo hearing before it, OTA heard, reviewed, and analyzed the evidence submitted by both parties. As such, we will not disturb OTA's determinations absent a showing that OTA was clearly wrong or abused its discretion, which is not present in the record before us. Accordingly, we find no error in OTA's determination on this issue.

### B. Judicial Notice

In his third assignment of error, the Assessor argues that OTA erred by taking judicial notice of the COVID-19 pandemic without showing the effect of the pandemic on natural gas lines or on MarkWest's income. The Assessor claims that the record is devoid of evidence showing that the COVID-19 pandemic had any effect on the value of MarkWest's pipelines, and as a disputed fact, such effect was not subject to judicial notice. We agree, in part.

While OTA is not constrained by the West Virginia Rules of Evidence, there is no mechanism that permits OTA to take judicial notice of disputed facts. A court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." W. Va. R. Evid. 201(b). Thus, the "effect the COVID[-19] pandemic had on the U.S. economy" is not susceptible to judicial notice. However, to the extent that OTA was compelled to use judicial notice of the COVID[-19] pandemic and its effect on the U.S. economy to support the factual determination that the reduction in production was the product of external forces, we find it to be harmless error.

Upon a review of the record, we find ample support for OTA's finding that external forces acted as a catalyst in the loss of income application. Beginning in 2018, MarkWest began installing 20" NGL lines in anticipation of an increase in production of NGLs. The expected increase did not occur due to market activity, which lessened demand for NGLs and led to a scaling back of the construction of planned natural gas processing facilities. This scaling back was beyond the control of MarkWest and directly impacted the company. MarkWest submitted uncontroverted evidence that the entire oil and natural gas market shifted at the outset of the COVID-19 pandemic and the reduction in anticipated volumes was an indicator of economic obsolescence. While OTA incorrectly used judicial notice of the impact of COVID-19 on the global economy, it did properly analyze the specific impact and the downturn the pandemic had on MarkWest's pipelines.

20

While the Assessor maintained that MarkWest never showed a reduction in income throughout the period at issue, such evidence does not contradict the evidence showing the reduction in anticipated volumes resulted from the market volatility, which was beyond the control of MarkWest. Therefore, we find no reversible error in OTA's determination that the reduction in this matter was attributable to external forces acting upon the supply and demand for MarkWest pipelines.

C.    **Methodology Used to Calculate Economic Obsolescence**

Finally, we address the Assessor's remaining assignments of error and MarkWest's cross-assignment of error, which each relate to the methodology used by the parties' respective experts in calculating the need for economic obsolescence reduction in the appraised value for the subject pipelines, and the amount of such reduction, if any. We begin by noting that all property in West Virginia is required to be annually assessed at sixty percent of its true and actual value. *See* W. Va. Code § 11-3-1. When valuing commercial and industrial property, three (3) approaches are considered and used in estimating fair market value: (A) cost, (B) income, and (C) market. *See* W. Va. Code St. R. § 110-1P-3.4.3.1. The cost approach may apply most consistently to machinery and equipment. W. Va. Code St. R. § 110-1P-3.4.3.2. Further, the "cost approach" is the "appraisal process in which replacement cost of improvements, less all types of depreciation" is used to estimate the fair market value of property. W. Va. Code St. R. § 110-1P-2.4 (2013).

Use of the cost approach is also reflected in West Virginia State Tax Department Administrative Notice 2021-12, in which the Tax Commissioner states that the Tax Department primarily relies upon the cost approach in valuing industrial machinery and equipment. While this administrative notice focuses on industrial property, it is undisputed that the Assessor relied on the cost approach for valuing MarkWest's NGL pipelines at issue.

The Tax Department annually provides "trend and percent good tables" to assessors for purposes of valuing commercial and industrial properties, with physical depreciation accounted for in the "percent good tables." Per the administrative notice, "[t]he Tax Commissioner uses the Marshall Valuation Service, an appraisal guide, as the source of information for the trend and depreciation tables and provides this information to all fifty-five counties as a guide for the appraisal of personal property." Under the cost approach, assessors are required to consider three types of depreciation when physically inspecting and valuing commercial and industrial personal property: physical deterioration depreciation, economic obsolescence, and functional obsolescence. *See* W. Va. Code St. R. § 110-1P-3.4.3.3 (2013). While the assessor is afforded discretion in choosing the method of appraising commercial and industrial property, the method chosen must be the "most accurate." *See* Syl. Pt. 5, *In re Tax Assessment Against American Bituminous Power Partners, L.P.*, 208 W. Va. 250, 539 S.E.2d 757 (2000).

22

As previously discussed, in 2013, the legislative rule was amended to specifically address steps assessors must undertake when considering a potential application of obsolescence. The 2013 amendments provided that economic obsolescence is best measured through application of either a market approach method or an income approach, with an income approach method normally used. *See* W. Va. Code St. R. § 110–1P-3.5.2 (2013). On appeal, the Assessor argues that OTA erred in accepting MarkWest's "inutility" or "throughput deficiency" argument as a basis for economic obsolescence as such methodology is not an income approach to valuing the commercial property involved in this matter. Particularly, the Assessor asserts that the utilization of a particular asset does not necessarily correlate with value, and, more importantly, identification of a utilization percentage on a particular date does not show a loss in value. Therefore, the Assessor maintains that OTA's reliance on inutility in evaluating obsolescence is clear error. We disagree.

The establishing of economic obsolescence is a factual determination. As such, OTA is well within its discretion to review the inutility or throughput deficiency arguments to determine whether economic obsolescence existed. The record below clearly shows that MarkWest's quantification of economic obsolescence was a result of MarkWest's accepted capitalization of income loss method and not the inutility or throughput deficiency percentages. While the Assessor may disagree with OTA's ultimate decision to find credible evidence for application of a 35% economic obsolescence reduction in assessed value for the subject pipelines, such a determination rests inherently

23

within the independence of OTA and should not be disturbed unless clearly wrong. Here, there is no evidence to suggest that OTA's decision was clearly wrong, as it was based upon the credible evidence submitted during the evidentiary hearings. Accordingly, we find no error in OTA's usage of inutility or throughput deficiency to establish the existence of economic obsolescence.

As to the Assessor's claims that OTA's acceptance of MarkWest's capitalization of income loss method and the resulting economic obsolescence percentage as accurate and reliable was improper, we find no error. Here, the Assessor argues OTA erred in relying on the capitalization of income loss model, which he contends is premised on a flawed comparison to peer financial performance. Specifically, the Assessor alleges that MarkWest's evidence developed a weighted average cost of capital ("WACC") based upon the financial performance of twenty-four guideline companies, which were not peers and were not of the same volatility as the FERC regulated pipelines. When defending this position, MarkWest's expert, Mr. Kistler, testified that he chose to analyze these companies because they were more diversified. Because the guidelines were based on more volatile companies, the Assessor argues that OTA should have rejected the analysis as it was not a true representation of the risks associated with MarkWest's non-diversified asset and resulted in a substantially higher WACC than what was reported to FERC annually. Further, the Assessor maintains that MarkWest's growth rate was well beyond the 0% allocated in the Report. Using a higher WACC causes a lower valuation, and using a lower growth rate causes a lower valuation, which produced a flawed outcome according to the

Assessor. For these reasons, the Assessor maintains that the capitalization of income loss method should have been disregarded. We disagree.

In this matter, competing expert testimony was introduced. The KE Andrews Report maintained that the capitalization of income loss methodology fit within the income-based approach confines found in the legislative rules and have been accepted by other jurisdictions as proper evidence to establish an economic obsolescence allocation. While the Wisdom Report questions the WACC and growth rate used within the KE Andrews Report, the weight provided to this competing evidence is left to the trier of fact. Here, OTA, the finder of fact, found the Wisdom Report to be unpersuasive.

Essentially, the Assessor disagrees with OTA's credibility determination following an evidentiary hearing, and is requesting this Court to look at the record and reach a more favorable conclusion. However, this is not sufficient to establish error on appeal. It is well established that, "[a]n appellate court does not reweigh the evidence[.]" *State v. Thompson*, 220 W. Va. 246, 254, 647 S.E.2d 526, 534 (2007) (per curiam); *Coles v. Century Aluminum of W. Va.*, No. 23-ICA-81, 2023 WL 7202966, at \*2 (W. Va. Ct. App. Nov. 1, 2023) (memorandum decision) (noting that an appellate court will not reweigh the evidence presented below on appeal). Credibility determinations by the finder of fact in an administrative proceeding shall be binding unless patently without basis in the record. *See Reed v. Pompeo*, 240 W. Va. 255, 261, 810 S.E.2d 66, 72 (2018); *see also Webb v. West*

*Virginia Bd. of Medicine*, 212 W. Va. 149, 156, 569 S.E.2d 225, 232 (2002) (quoting

*Martin v. Randolph Cnty. Bd. of Educ.*, 195 W. Va. 297, 304, 465 S.E.2d 399, 406 (1995)).

After reviewing the expert opinions submitted and testimony of the parties, OTA determined that Mr. Kistler and the KE Andrews Report were more persuasive than the Wisdom Reports and the Hobart Report. OTA provided sufficient rationale for reaching this decision. Specifically, OTA found Mr. Wisdom's usage of the Handy-Whitman trend and depreciation tables in his first report to be unconvincing and his income capitalization method to be unexplained. As to the second Wisdom Report, OTA determined that his two income method calculations (direct capitalization & discounted cash flow) were equally unavailing and unconvincing based on numerous omissions and unexplained anomalies. In doing so, OTA concluded the evidence introduced by the Assessor in this matter was less persuasive than evidence presented by MarkWest. Accordingly, we find no error in this regard.

Additionally, the Assessor argues that OTA arbitrarily selected and used an obsolescence percentage (35 %) that was not even in agreement with MarkWest's expert's opinion. Despite correctly limiting Mr. Kistler's methodologies to one that fits within an income approach under West Virginia law, the Assessor alleges that OTA ignored Mr. Kistler's testimony that his determination was a result of blending all four methodologies to produce an appropriate percentage of economic obsolescence. The Assessor argues that the 35% reduction was allegedly cherry-picked from the KE Andrews Report and

26

arbitrarily applied to the Assessor's value. Further, assuming the 35% reduction was supported, the Assessor maintains that its application was never intended to be applied to the assessed value, only the net book value reported on MarkWest's FERC filings. By applying the reduction in this way, the Assessor argues that OTA committed clear error and acted arbitrarily and capriciously. We disagree.

The 35% reduction allocated to economic obsolescence found by OTA is the percentage provided by the capitalization of income loss method. While Mr. Kistler opined that his final conclusion was to blend the four methodologies to determine a most appropriate obsolescence percentage, OTA was not forced to accept a blended percentage nor was it precluded from accepting a percentage allocated to an acceptable methodology. Additionally, while Mr. Kistler testified that he used the FERC net cost in establishing the 35% figure, nothing in his testimony prohibited such percentage from being utilized in connection with the assessed value to correctly reflect West Virginia law.

When considering the persuasiveness of the KE Andrews Report's percentage and the second Wisdom Report's percentage of obsolescence, OTA concluded the former to be the most credible. OTA is granted broad authority to evaluate the record of the proceeding before it and to decide upon the method that it deems most appropriate to quantify economic obsolescence, whether that be a single method or the base valuations for which the percentage was derived. Here, OTA's decision to use the 35% as allocated under what it perceived as the most correct methodology contained in the most credible

report is supported by the record and within its authority. *See* Syl. Pt. 4, *W. Va. State Police v. Walker*, 246 W. Va. 77, 866 S.E.2d 142 (2021) ("A reviewing court must evaluate the record of an administrative agency's proceeding to determine whether there is evidence on the record as a whole to support the agency's decision. The evaluation is conducted pursuant to the administrative body's findings of fact, regardless of whether the court would have reached a different conclusion on the same set of facts.").

### D.    MarkWest's Cross-Assignment of Error

Lastly, we address the cross-assignment MarkWest raised in response to the Assessor's appeal. MarkWest argues that OTA erred in holding that only one of the four submitted methods for quantifying economic obsolescence was valid under West Virginia law. MarkWest avers that West Virginia law does not contain a mandatory directive that economic obsolescence must be measured by the three approaches contained in the Legislative Rules. However, we decline to address this assignment of error as it would require this Court to provide an advisory opinion, which is not permitted under the long-standing precedent of the SCAWV.

"Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes. The pleadings and evidence must present a claim of legal right asserted by one party and denied by the other before jurisdiction of a suit may be taken.' *Mainella v. Board of Trustees of Policemen's Pension or Relief Fund of City of*

28

*Fairmont*, 126 W. Va. 183, 185-86, 27 S.E.2d 486, 487-88 (1943)." Syl. Pt. 2, *Harshbarger v. Gainer*, 184 W. Va. 656, 403 S.E.2d 399 (1991). To permit this Court to exercise its authority over parties to a suit, the parties must plead and then prove that there is an actual conflict between them that is redressable under the law. Here, MarkWest does not request a remand for additional consideration and has conceded that OTA has the authority to make the decision that it has made and does not object to such decision. Indeed, MarkWest desires this Court to affirm such decision, and weigh in on a subject that cannot be addressed in the absence of a remand request. Given this conflict and the breadth of the record below supporting the decision of OTA, we decline to provide the advisory opinion requested by MarkWest.

## IV. CONCLUSION

For the foregoing reasons, we affirm the October 9, 2024, Final Decision of OTA.

Affirmed.